698 A.2d 1115

**Cedrick WHITEHEAD**

v.

**STATE of Maryland.**

**No. 309, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Aug. 27, 1997.

Nancy Forster, Assistant Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for Appellant.

Devy Patterson Russell, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore, and Joseph I. Cassidy, State's Attorney for Hartford County, Bel Air, on the brief), for Appellee.

Argued before MURPHY, C.J., and DAVIS and SONNER, JJ.

SONNER, Judge.

On Sunday, September 12, 1994, appellant Cedrick Whitehead was driving south on Interstate 95 when Trooper Bernard Donovan, who was working a K–9 shift that evening, stopped him for driving 72 miles per hour in a 55 mile per hour zone. In response to Trooper Donovan's requests, Whitehead gave his name and date of birth and produced his car registration, but stated he did not have his driver's license with him. Apparently, because he did not have his driver's license in possession, Trooper Donovan ordered Whitehead out of the car, but told the passenger Damon Schenck to remain in

the front seat. Trooper Donovan asked Whitehead where he was coming from, and Whitehead replied New Jersey, where he had driven the previous Saturday, and was returning to Baltimore. Trooper Donovan went back to Schenck and asked him the same question. Schenck replied that they had gone to New Jersey the previous Sunday. He also asked them separately whom they had visited and received different responses: Whitehead said he had visited with friends, and Schenck said his grandmother. Trooper Donovan contacted his barrack by radio to run a check for outstanding warrants and to see if the automobile had been reported stolen, as well as to determine whether Whitehead had a valid driver's permit.

Trooper Donovan testified at a suppression hearing that he became suspicious of Whitehead because of the conflicting responses. While awaiting a report on his request for information, he ordered appellant into the police cruiser, where he handed him a consent to search form which, according to his testimony, he uses "[as] basically a tool ... to judge the person's reaction to, you know, whether I am going to search for contraband or not." According to Trooper Donovan, Whitehead became nervous, began to stutter, and refused to sign the form. During this time, a report came over the police radio that appellant's driving privileges were in order, he was not wanted on any outstanding warrants, and the car he was driving was not stolen. Trooper Donovan, nevertheless, detained both Whitehead and Schenck while he conducted a K–9 scan of the car. The dog alerted to the driver's door, and Trooper Donovan found crack cocaine in a backpack behind the driver's seat. According to the trooper's testimony, the entire process lasted approximately five minutes.

Trooper Donovan arrested Whitehead, charging him with possession with intent to distribute cocaine, possession of cocaine, and importation of cocaine into Maryland. On December 12, 1995, the State convicted Whitehead on all three charges at a bench trial in the Circuit Court for Harford County (Whitfill, J.).

On appeal, Whitehead raises two issues, which we have restated slightly:

1. Did the lower court err in denying Whitehead's motion to suppress the seized cocaine?

2. Did the lower court err in failing to dismiss the charges for lack of a speedy trial?

Because we answer the first issue in the affirmative, which will result in reversal, we do not reach the second.

This case involves the current widespread police tactic of using violations of the traffic laws as a means of singling out particular vehicles to search for contraband narcotics. In *Whren v. U.S.*, — U.S. —, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), the Supreme Court held that, as long as the police *could* have stopped the driver for a traffic violation, it is inconsequential that the police actually stopped the driver to investigate another offense. By all indications, pretextual traffic stops have increased markedly all over the country since the *Whren* decision.[1] Using the traffic laws as pretexts for stopping to search the occupants and the interior of the vehicles has created intense criticism and some allegations of racism in the enforcement of the laws in Maryland, as well as in other states. Appellant and his passenger are both African–Americans; however, on the basis of the record before this Court, we can take no position as to the merits of the allegations of racism in police procedures raised in this or in other similar cases concerning the enforcement of the controlled dangerous substance laws on Interstate 95, but we do note that the allegations exist.[2]

Since it appears that the use of the traffic laws as pretexts to make stops has become a standard law enforcement strategy with respect to narcotic laws, we think it appropriate to reinforce what we have said in two decisions about what is permissible and not permissible for automobile searches when

---

**1.** David A. Harris, *Whren v. United States: Pretextual Traffic Stops and 'Driving While Black,'* THE CHAMPION, March 1997, at 41.

**2.** *See* Angela J. Davis, *Race, Cops and Traffic Stops,* 51 U. Miami L.Rev. 425, 430 (1997), for a historical development of the litigation in Maryland over the police practice of detaining particular traffic violators in order to conduct a search of narcotics.

the drivers have been stopped for traffic violations. Of course, such stops must comply with the Fourth Amendment of the Constitution of the United States, but it is important to note that cases interpreting the Fourth Amendment have held that a search incident to a stop for violation of the traffic laws has some limitations that do not govern a search incident to an arrest for a violation of the criminal laws of this State.

During oral argument, the Assistant Attorney General for the State of Maryland conceded that Trooper Donovan was a part of a particular detail whose purpose in patrolling Interstate 95 was the enforcement of the controlled dangerous substance laws. His testimony at trial bears that out. His having been accompanied by a K–9 trained to detect narcotics reinforces the Attorney General's concession. We, consequently, can and do properly infer that his selection of particular vehicles violating the speed limits, while ignoring others, is influenced by his suspicion that the occupants may, in addition to speeding, also be in violation of the criminal laws that he has been detailed to enforce. The testimony at the hearing left little doubt that Trooper Donovan's selection of speeders to process was a pretext for observing the stopped vehicle and the passengers for signs of violation of Maryland's controlled dangerous substance laws. The concession and circumstances lead to the inescapable conclusion that Trooper Donovan stopped Whitehead to carry forth the mission of his detail, namely, to look for violations of the State's drug laws.

In *Snow v. State*, 84 Md.App. 243, 578 A.2d 816 (1990), this Court disapproved law enforcement officers detaining motorists for a period of time beyond that which would be necessary to issue a traffic citation or decide to permit the motorists to continue on their way. The Court, speaking through Judge Rosalyn B. Bell, stated:

The intrusion permitted "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). Here, the purpose of the stop was to warn or issue a ticket to Snow for speeding. That purpose was fully fulfilled, but the detention was continued.

The Supreme Court has also said the "brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion." *United States v. Place*, 462 U.S. 696, 709, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110 (1983). Although it is true that the duration of the stop is a factor in calculating whether an intrusion is within constitutional limitations, *see Royer*, 460 U.S. at 500, 103 S.Ct. at 1325, the State must first demonstrate a reasonable, articulable suspicion that a crime is being or is about to be committed. The State, as we have stated above, did not adequately demonstrate a reasonable, articulable suspicion. . . .

*Id.* at 264–65, 578 A.2d 816.

Again, in *Munafo v. State*, 105 Md.App. 662, 660 A.2d 1068 (1995), we condemned a detention by the police under circumstances similar to those we are called upon to review here. Munafo, after being stopped for traffic violations, was asked by the arresting sheriff whether he had any drugs or weapons and for permission to search his car. Munafo replied that he had no drugs or weapons and refused to consent to a search. The deputy returned to the patrol car, radioed for backup, and waited for the results of the license check. He was informed that the rental agreement and license checked out. The deputy did not issue a warning or citation, but waited for the arrival of the backup. When the backup arrived, the officers searched the car and found marijuana and cocaine. Munafo was arrested, tried, and convicted. This Court held that the motion to suppress should have been granted, reasoning that

in *Snow*, 84 Md.App. at 248, 578 A.2d 816, we concluded that the purpose of the traffic stop is to issue a citation or warning. Once that purpose has been satisfied, the continued detention of a vehicle and its occupant(s) constitutes a second stop, and must be independently justified by reasonable suspicion.

*Munafo*, 105 Md.App. at 670, 660 A.2d 1068.

In *Munafo*, the activity that we condemned was the sheriff's awaiting the backup instead of issuing the citation. We found

the detention for that purpose was illegal. *Snow* and *Munafo,* however, differ somewhat from the case we have here. Trooper Donovan, in stopping Whitehead, did not have, as his primary purpose, the detaining of a motorist to issue a warning or a citation, as the law enforcement officers may have had in *Snow* and *Munafo.* Instead, as the record shows, he candidly admitted he was observing the occupants to see if his hunch was correct that they may have been carrying illegal narcotics in the car. He did not set about to issue a citation or warning but, instead, from the beginning, actively sought to determine whether, in his mind, there were sufficient circumstances and facts that would then allow him to proceed to search for narcotics, the primary law enforcement task for which he was using the traffic laws. We observe from the record that part of his activity was to engage the two occupants of the automobile in conversation about the details of their journey to determine whether they were consistent.

After receiving information that Whitehead's papers were in order, that he was not wanted on any outstanding warrants, and that the car was not stolen, Trooper Donovan was under a duty expeditiously to complete the process of either issuing a warning or a traffic citation for whatever traffic offenses that he had observed. The response over his radio did not provide any information that could possibly justify further detention, except for that limited purpose. Because Donovan had become suspicious of what he interpreted as conflicting answers from Whitehead and Schenck, instead of issuing a warning or citation, he began what, for him, was a standard tactic, requesting Whitehead to sign a form to waive his rights under the Fourth Amendment of the United States Constitution so as to permit a search of the vehicle; Whitehead refused to do so. Trooper Donovan informed the court, during the suppression hearing, that he suspects drug possession if the traffic violator appears nervous upon being presented with a consent to search form.

For this Court, or any court, to condone the use of a citizen's reaction to a consent form as a litmus test to deter-

mine probable cause would be to render the Fourth Amendment a dead letter and the requirement of the police to secure a valid waiver a nullity. The exertion of the right to be protected from an illegal search could become the legal justification for its denial. A citizen's exercise of a constitutional right cannot ever be used by law enforcement to justify an illegal detention, nor can it be considered as a legitimate basis to infer probable cause.

■ Other than the perceived nervousness of Whitehead when he was asked whether he was willing to sign a form surrendering his right not to have the police search his car, the only facts Trooper Donovan had to support his suspicion of criminal possession of narcotics were the different answers from Whitehead and his passenger. The use of the "conflicting" details of their visit in New Jersey is unavailing here to show probable cause to suspect possession of narcotics. There is nothing about not having their stories together, about just whom they visited, or about the day that they left Baltimore, that somehow yields an inference of possession of narcotics. Or, put another way, there is nothing about narcotics laws violators that police can recognize from an inability to agree upon these details of their journey to New Jersey. In asking the questions, Trooper Donovan was not making inquiry to further the enforcement of the 55 mile speed limit. He was looking for justification to intrude upon the privacy of the person whom he had detained. Our review of the "inconsistency"—the different dates that their trip began and whom they had gone to visit—does not support any inference that the occupants were in possession of narcotics or that the automobile that Whitehead was driving contained narcotics.

■ There is nothing that Donovan observed that even remotely indicates an involvement in the transportation of drugs. He did not observe scales, bongs, glassine bags, or instruments which may have a law abiding use, but about which an educated police officer could testify can also be consistent with drug dealing and, therefore, could give rise to a permissible inference that criminal narcotic activity is afoot.

Law enforcement personnel do not have the discretion to select neutral human behavior as the justification for the formation of probable cause. Wayne R. LaFave, *Search and Seizure, A Treatise on the Fourth Amendment,* Section 3.6(f) (2d ed.1987); *People v. Reynolds,* 94 Ill.2d 160, 68 Ill.Dec. 122, 445 N.E.2d 766 (1983); *Donaldson v. State,* 46 Md.App. 521, 534, 420 A.2d 281 (1980).

█ The nervousness, or lack of it, of the driver pulled over by a Maryland State trooper is not sufficient to form the basis of police suspicion that the driver is engaged in the illegal transportation of drugs. There is no earthly way that a police officer can distinguish the nervousness of an ordinary citizen under such circumstance from the nervousness of a criminal who traffics in narcotics.[3] An individual's physiological reaction to a proposed intrusion into his or her privacy cannot establish probable cause or even grounds to suspect. Permitting a citizen's nervousness to be the basis for a finding of probable cause would confer upon the police a degree of discretion not grounded in police expertise, and, moreover, would be totally insusceptible to judicial review.

█ As in *Munafo,* "[w]hether appellant was effectively stopped twice for constitutional purposes is not a question of fact, but one of constitutional analysis. Accordingly, the trial

---

**3.** The circumstances of a pending class action lawsuit are indicative of this point. Upon receiving word from a client that Illinois State Police targeted Hispanics for stops and searches, the attorney hired a private investigator, Peso Chavez, to drive along Illinois highways to determine whether the allegations were true. Although Chavez meticulously observed the traffic laws and drove as cautiously as possible, a state police officer eventually stopped him. The officer asked Chavez to consent to a search of his car. When Chavez refused, the officer conducted a K–9 scan. The officer informed Chavez that the dog had alerted to the presence of narcotics, and that Chavez would have to wait in the patrol car while police conducted a thorough search of his vehicle. The hour long search did not uncover any drugs, and Chavez was subsequently released. Chavez stated that, despite his twenty years of experience as a private investigator and his knowledge that he was part of a reverse sting, he still reported feeling extremely nervous and frightened during the stop. Chavez, an ordinary citizen who was fully aware that he would likely be stopped and searched, experienced the same reactions as a criminal who traffics in narcotics. *Harris, supra* n. 1 at 42.

court's conclusion in that regard is not entitled to deference." *Munafo,* 105 Md.App. at 672, 660 A.2d 1068. As in *Snow* and *Munafo,* we find the detention while Donovan attempted to search out suspicious behavior to confirm his suspicion that Whitehead or his passenger possessed drugs was constitutionally impermissible. Exactly when he began the prohibited detention is not completely ascertainable. At the very latest, however, it began when he learned that he had no reason to detain Whitehead further because he learned there was no reason to do so from the radio report from his barrack. On the record presented, we find no justification for his abandoning the requirement of proceeding with the issuing of the traffic citation and beginning the outer search of the car with the K–9. As a consequence, the detention was unlawful, and the ensuing search into the backpack contents should have been suppressed.

We are not condemning Trooper Donovan's motivation. We are mindful of the Supreme Court's opinion in *Whren* that put an officer's motivation for stopping a motor vehicle beyond attack for purposes of suppressing the fruits of a search. *Whren* would seem to hold that the actual motivation of the individual officer, in choosing a particular traffic violator, cannot be subject to constitutional inquiry or challenge. *Whren,* a 9–0 decision, without concurring opinions, did not provide guidance as to just how far the police may go in detaining and interrogating someone who has been stopped on the pretext of the enforcement of the traffic laws. The detention in *Whren* that the Supreme Court approved was brief, and the arrest for violation of the narcotics laws instantaneously followed the stop. We think it would be a mistake to read *Whren* as allowing law enforcement officers to detain on the pretext of issuing a traffic citation or warning, and then deliberately to engage in activities not related to the enforcement of the traffic code in order to determine whether there are sufficient indicia of some illegal activity. Stopping a car for speeding does not confer the right to abandon or never begin to take action related to the traffic laws and, instead, to attempt to secure a waiver of Fourth Amendment rights from

a citizen whose only offense to that point is to have been selected from among many who have been detected violating a traffic regulation.[4] An interpretation of *Whren* that is consistent with *Snow* and *Munafo* requires the police to issue the citation or warning efficiently and expeditiously with a minimum of intrusion, only that which is required to carry forth the legitimate, although pretextual, purpose for the stop. We are condemning not the stop itself, but the detention after the pretextual stop that was for the purpose of determining whether the trooper could acquire sufficient probable cause or a waiver that would permit him to search the car for illegal narcotics.

We should also point out that, contrary to the argument raised by appellee, this search is not controlled by the line of cases permitting law enforcement officers to search for weapons in order to protect themselves in the dangerous circumstances of a confrontation with a person whom they have reason to suspect of criminal activity. Following *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), under some circumstances, officers are entitled to stop and frisk as a reasonable precaution to assure their own safety. *Aguilar v. State*, 88 Md.App. 276, 594 A.2d 1167 (1991); *Allen v. State*, 85 Md.App. 657, 584 A.2d 1279 (1991); *Weedon v. State*, 82 Md.App. 692, 573 A.2d 92 (1990); *Anderson v. State*, 78 Md.App. 471, 553 A.2d 1296 (1989). The Supreme Court, in *Terry*, recognized the necessity for permitting a limited search

---

4. Driving is amongst the most heavily regulated activities in today's society. Besides the obvious moving violations such as speeding and running red lights, state traffic codes also comprise a myriad of other offenses, many of which are minute and insignificant. For instance, state traffic codes include provisions on safety inspections, pollution control, vehicle noise, tire tread, lights, and countless others. In fact, studies conducted on a stretch of Interstate 95 between Baltimore and Delaware revealed that 93% of all drivers committed some type of traffic violation. In light of the broad and extensive nature of state traffic codes, the police essentially have unlimited discretion to stop any driver, for any reason. Since every driver on the roadways will eventually violate some trivial regulation at the very least, police officers can theoretically stop any motorist they wish. *Harris, supra* n. 1 at 41.

for the purpose of determining if the person in custody is armed. *Terry*, on its facts, is readily distinguishable from the kind of search in the case we have before us. In *Terry*, Officer Martin McFadden was patrolling in plain clothes and watched three men, who did "not look right to him," walking back and forth in front of a jewelry store and looking in the windows in a way that, based on his 39 years as a policeman, led him to conclude that they were "casing a job, a stick-up." The Supreme Court concluded that Officer McFadden had reasonable grounds to believe that the suspect was armed and, accordingly, a search of the suspect's outer clothing was permissible for the officer's own safety, as well as the safety of others.

In this case, Trooper Donovan, unlike Officer McFadden, did not articulate that he wished to conduct a search to protect himself, as authorized by *Terry* and the cases in Maryland following it. The K–9 was not sniffing for weapons, but for illegal narcotics. Trooper Donovan's search was based on some generalized and vague suspicion that, in his opinion, the driver of the car, or possibly the passenger, may have been violating the controlled dangerous substance laws. There was absolutely no evidence suggesting that the driver or passenger possessed weapons and, therefore, Trooper Donovan needed to search to protect himself. *Terry* and its progeny are not applicable to the present situation. We find that the search was unconstitutional.

**JUDGMENT REVERSED. HARFORD COUNTY TO PAY COSTS.**