773 A.2d 564

**James RUSSELL**

v.

**STATE of Maryland.**

**No. 0802, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

May 31, 2001.

640

642

Nancy S. Forster, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief) Baltimore, for appellant.

Shannon E. Avery, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore and David R. Ruark, State's Atty. for Wicomico County, Salisbury, on brief) for appellee.

Submitted before HOLLANDER, DEBORAH S. EYLER, MARVIN H. SMITH, (Retired, Specially Assigned) JJ.

MARVIN H. SMITH, Judge, Retired, Specially Assigned.

At a bench trial in the Circuit Court for Wicomico County, appellant James Russell pleaded not guilty, on an agreed statement of facts, to unlawful possession of a handgun.[1] The court found appellant guilty and imposed a prison sentence of three years, with all but 18 months suspended, in favor of 18 months of supervised probation.

## ISSUE

In this appeal, appellant argues that the trial court erred in denying his pre-trial motion to suppress the handgun, and that the judgment against him must therefore be reversed. We find no merit in this argument and affirm the judgment of the trial court.

## STANDARD OF REVIEW

In reviewing the denial of a motion to suppress evidence,

> we make our own independent constitutional appraisal. We make the appraisal by reviewing the law and applying it to the peculiar facts of the particular case.... When the facts are in dispute, we accept them as found by the trial judge unless he is clearly erroneous in his judgment on the evidence before him. In ascertaining whether he is clearly erroneous, we give "due regard to the opportunity of the trial court to judge the credibility of the witnesses," as commanded by Md. Rule 8–131(c).... [T]he relevant facts which we consider "are limited to those produced at the suppression hearing ... which are most favorable to the State as the prevailing party on the motion." ...

*Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239, 1240–41 (1990), *disapproved in part on other grounds, Wengert v. State,* 364 Md. 76, 89 n. 4, 771 A.2d 389, 396 n. 4 (2001). *See*

---

1. A related charge of resisting arrest was placed on the stet docket.

**644**

*also Ferris v. State,* 355 Md. 356, 368–69, 735 A.2d 491, 497 (1999).

## FACTS

The State's key witness at the hearing on the motion to suppress was Officer Jason Yankalunas of the Salisbury Police Department. Officer Yankalunas explained that appellant was arrested after the car in which he was a passenger was pulled over during a routine traffic stop.

Officer Yankalunas testified that, in the early evening of November 11, 1999, he and another officer were riding in a car driven by Officer Richard Hagel. At 4:50 PM, the officers saw the driver of a car on Delaware Avenue in Salisbury commit a turn signal violation. They alerted the driver to pull over in the parking lot of a nearby business.

The driver of the car was Monique Horsey. Officer Yankalunas observed Officer Hagel approach the driver's window and ask Ms. Horsey for her driver's license. Ms. Horsey responded that she did not have her license with her. At that point, Officer Yankalunas approached the passenger window in order to "see if [appellant] had a driver's license so that had [Ms. Horsey's] license come back suspended as it did, he could drive the vehicle if he were valid." Officer Yankalunas stated: "I approached him and asked him about his driver's license and his driving status."[2]

Officer Yankalunas testified that, as he approached the passenger window, appellant rolled the window down. As the officer inquired about appellant's driver's license, appellant "became extremely nervous." Officer Yankalunas observed that appellant "was looking around" and "began to fidget a bit." Although appellant was wearing a heavy leather jacket, the officer also noticed that he "began to breathe more heavily and swallow very hard." Officer Yankalunas explained that he had conducted a large number of traffic stops, and that the

---

2. There was no testimony as to what the third officer was doing during this time.

level of nervousness exhibited by appellant was unusual for a mere passenger.

Appellant went through all of his pockets apparently looking for his license. He put both hands in a front pocket of his jacket and "fooled around with something" therein. Officer Yankalunas saw appellant "pull his hands out, but when he did, he put something back into the pocket...."

Officer Yankalunas testified that he was aware that the area in which the traffic stop was made was considered to be a "very high crime, high drug area" area and that a "great deal of weapons" are recovered there. He observed that the pocket into which appellant pushed something back was large enough to conceal a handgun. Those facts, combined with what he considered to be excessive nervousness on appellant's part, caused him to suspect that appellant might be carrying a weapon.

The officer then ordered appellant to get out of the car and explained to appellant that he would be patted down for weapons. Appellant got out of the vehicle but, despite Officer Yankalunas' repeated instructions to stand with his hands on the roof of the car, refused to take his hands out of his pockets. Officer Yankalunas informed appellant that if he would not cooperate he would have to be handcuffed. The officer took a step toward appellant as if to handcuff him, and appellant then pulled a handgun from his front jacket pocket and threw it onto the front passenger seat of the car. At that point, Officer Yankalunas shouted "gun" and the other two officers came to assist him. Appellant was arrested and handcuffed and the handgun was recovered.

The driver of the car, Monique Horsey, testified for the defense. Ms. Horsey testified that appellant is her fiancé and that she lived at an address on Delaware Avenue at the time of the traffic stop. All of the documents in the trial record, which were before the court at the suppression hearing, indicate that appellant lived at the same address.

Ms. Horsey stated that Officer Hagel specifically instructed Officer Yankalunas to "ask the passenger for identification."

She thus tacitly contradicted Officer Yankalunas' testimony that he merely asked appellant if he had a valid driver's license. Ms. Horsey further stated that appellant did not get out of the car on his own. Rather, she asserted that several officers pulled him out of the vehicle and handcuffed him immediately.

## DISCUSSION

Appellant contends that the trial court erred in refusing to suppress the handgun, in that the handgun was the fruit of a seizure conducted in violation of the Fourth Amendment to the Constitution of the United States. Appellant's principal argument is that he was unlawfully seized "the moment Officer Yankalunas asked [him] for his identification." In the alternative, appellant argues that he was unlawfully seized when he was ordered to get out of the car so that Officer Yankalunas could conduct a pat-down.

■ Appellant did not present his principal argument to the trial court at the hearing on the motion to suppress or at any other point below. His counsel argued only that Officer Yankalunas did not have a reasonable articulable suspicion to pat appellant down. Thus, the argument is not preserved and is not properly before this Court. *See, e.g., McKoy v. State*, 127 Md.App. 89, 99, 732 A.2d 312, 317 (1999).

Had appellant's principal argument been properly preserved, we would find it to be without merit. We shall address the argument for guidance purposes. We shall hold that appellant's alternative argument is without merit as well.

### —Questioning Regarding Driver's License—

■ In *Ferris*[3], 355 Md. at 369, 735 A.2d at 497–98, the Court of Appeals summarized:

---

3. In *Ferris*, 355 Md. 356, 735 A.2d 491, the Court of Appeals held that the continued detention of a motorist after the issuance of a speeding ticket, without additional justification, was unlawful.

The Fourth Amendment protects against unreasonable searches and seizures, including seizures that involve only a brief detention.... The Supreme Court has made clear that a traffic stop involving a motorist is a detention which implicates the Fourth Amendment.... It is equally clear, however, that ordinarily such a stop does not initially violate the federal Constitution if police have probable cause to believe that the driver has committed a traffic violation.... Nonetheless, the Supreme Court has also made clear that the detention of a person "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." ...

Neither the Supreme Court, the Court of Appeals, nor this Court has addressed whether police may lawfully detain a passenger in a vehicle stopped pursuant to a routine traffic stop. In *Maryland v. Wilson,* 519 U.S. 408, 415, 117 S.Ct. 882, 886, 137 L.Ed.2d 41 (1997), the Supreme Court held that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." The Court expressly declined to comment upon whether the officer could forcibly detain such passengers. *See id.* at 415 n. 3, 117 S.Ct. at 886 n. 3.

▮▮▮▮▮ Even if appellant had properly preserved his argument that he was unlawfully seized "the moment Officer Yankalunas asked [him] for his identification," we are confident that the issue could be resolved without plowing new ground. In *Ferris,* 355 Md. at 374–75, 735 A.2d at 500–01, the Court of Appeals explained:

Mere police questioning does not constitute a seizure.... This is so even if the police lack any suspicion, reasonable or otherwise, that an individual has committed a crime or is involved in criminal activity, because the Fourth Amendment simply does not apply.... If the engagement between the Petitioner and the officer was merely a "consensual encounter," no privacy interests were invaded and thus the Fourth Amendment is not implicated. Even when the officers have no basis for suspecting criminal involvement,

they may generally ask questions of an individual "so long as the police do not convey a message that compliance with their request is required." . . . If the police, in some way, communicate to a reasonable person that he or she was not free to ignore the police presence and go about their business, then the Fourth Amendment is implicated. . . .

(Citations omitted.) The *Ferris* Court went on to elucidate:

If a reasonable person would have felt free to leave, no seizure occurred. Conversely, if a reasonable person would have felt compelled to stay, a seizure took place. The focus, then, is "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." . . .

*Id.* at 375–76, 735 A.2d at 501.

 This "reasonable person" test is an "objective one," *id.* at 377, 735 A.2d at 502, and in applying it "a court must apply the totality-of-the-circumstances approach, with no single factor dictating whether a seizure has occurred." *Id.* at 376, 735 A.2d at 501. The Court of Appeals summarized in *Ferris*, 355 Md. at 377, 735 A.2d at 502:

Although the inquiry is a highly fact-specific one, courts have identified certain factors as probative of whether a reasonable person would have felt free to leave. . . . These factors include: the time and place of the encounter, the number of officers present and whether they were uniformed, whether the police removed the person to a different location or isolated him or her from others, whether the police indicated that the person was suspected of a crime, whether the police retained the person's documents, and whether the police exhibited threatening behavior or physical contact that would suggest to a reasonable person that he or she was not free to leave.

 Appellant's argument that he was unlawfully seized "the moment Officer Yankalunas asked [him] for his identification" would not survive the test set forth in *Ferris*. The trial court was not asked to, and did not, rule on whether appellant was detained at the point when Officer Yankalunas

approached him. In denying the motion to suppress, however, the court summarized the evidence as follows:

Officer Yankalunas approaches Russell, *asks him for identification, tries to determine whether or not he can legally drive a vehicle so he could operate the vehicle that had been stopped.*

According to Officer Yankalunas' testimony, Mr. Russell became extremely nervous to the point that you could see his heavy breathing through a thick jacket.

He was fidgety. He was looking around. When looking for his identification, in the officer's opinion pulled something out then tried to conceal something in his pocket ...

(Emphasis added.) It is thus apparent that the trial court accepted Officer Yankalunas' version of his encounter with appellant. "Judging the weight of evidence and the credibility of witnesses and resolving conflicts in the evidence are matters entrusted to the sound discretion of the trier of fact." *In Re Timothy F.*, 343 Md. 371, 379, 681 A.2d 501, 505 (1996). *See generally* Md. Rule 8–131(c); *Ferris*, 355 Md. at 368, 735 A.2d at 497; *Riddick*, 319 Md. at 183, 571 A.2d at 1240–41.

In asserting that Officer Yankalunas asked for "identification," appellant mischaracterizes the record. Officer Yankalunas' testimony, which the trial court accepted, established that the officer did not ask appellant for just any form of identification and was not seeking to establish appellant's identity. Rather, the officer specifically asked appellant if he had a valid driver's license. The evidence makes clear that appellant was sitting next to Ms. Horsey when Ms. Horsey admitted to Officer Hagel that she did not have a driver's license with her and that she had "tickets on [her] license." There could have been no question that Officer Yankalunas was attempting to ascertain whether appellant would be able legally to drive the car. Implicitly, if appellant had responded that he did not have a driver's license, the encounter would have ended.

Although Officer Yankalunas did not specifically inform appellant that he was free to leave, nothing in the record

suggests that appellant felt compelled, by anything other than his relationship with Ms. Horsey, to remain at the scene. There is no dispute that the traffic stop took place during daylight hours—albeit at dusk—only a short distance from appellant's home. Appellant was not stranded on some remote section of deserted highway in the middle of the night. *Compare People v. Spicer,* 203 Cal.Rptr. 599, 603–04, 157 Cal.App.3d 213, 218–20 (Cal.Ct.App.1984) (passenger of vehicle was unlawfully detained where: police stopped vehicle at 1:30 AM in residential neighborhood; one officer immediately approached passenger and requested her driver's license as other officer approached driver; and passenger's "freedom of movement was practically nil"). Had he so desired, appellant easily could have walked home.

There is no indication, moreover, that Officer Yankalunas or one of the other officers suggested to appellant that he was suspected of a crime. The evidence accepted by the trial court indicated only that: Officer Yankalunas approached the passenger window; appellant rolled the window down; and Officer Yankalunas asked appellant if he had a driver's license. Even if the trial court accepted Ms. Horsey's testimony that the officers pulled appellant from the car—and there is no indication that the court accepted that testimony—there would be no reason to believe that such conduct occurred before Officer Yankalunas developed a reasonable articulable suspicion, to be discussed in detail *infra,* that appellant was armed.

Based on the trial court's acceptance of Officer Yankalunas' testimony, and upon our own independent constitutional appraisal of the record, we are satisfied that a reasonable person in appellant's position would have felt free to leave when Officer Yankalunas asked if he had a driver's license. Had the argument been properly preserved, we would hold that appellant was not seized at that point.

### —Reasonable Articulable Suspicion for Frisk—

■ Appellant's alternative argument assumes *arguendo* that, until Officer Yankalunas ordered appellant to get out of the car, the encounter was consensual. Appellant argues, and

the State concedes, that when Officer Yankalunas issued the order, appellant was seized. In denying appellant's motion to suppress, the trial court found that, at that point, "there [were] reasonable grounds to believe that the defendant was armed and that [Officer Yankalunas] had a right to pat him down." Appellant disputes the court's finding and argues that there were no "articulable facts giving rise to a reasonable suspicion" that appellant was armed.

 "[P]olice officers may 'stop and frisk' an individual if they have a reasonable suspicion that the suspect is engaged in criminal activity and is presently armed and dangerous." *Stanford v. State,* 353 Md. 527, 532, 727 A.2d 938, 941 (1999). *See Terry v. Ohio,* 392 U.S. 1, 30–31, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889 (1967).

> While "reasonable suspicion" is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop.... The officer must be able to articulate more than an "inchoate and unparticularized suspicion or 'hunch' " of criminal activity.

*Illinois v. Wardlow,* 528 U.S. 119, 123–24, 120 S.Ct. 673, 675–76, 145 L.Ed.2d 570 (2000). In order for the seizure in question to have been lawful, Officer Yankalunas had to have had a reasonable articulable suspicion that appellant was engaging in criminal activity and was armed. Here, the suspected criminal activity *was* that appellant was unlawfully carrying a handgun.

Appellant suggests that, in determining that Officer Yankalunas had a reasonable articulable suspicion, the trial court improperly relied on Officer Yankalunas' testimony to the effect that appellant was excessively nervous during the encounter. Appellant points out that in *Ferris,* 355 Md. at 389, 735 A.2d at 509, the Court of Appeals explained that "unexceptional nervousness," in reaction to an encounter with a police officer, is simply "too ordinary to suggest criminal activity" and thus to support a reasonable articulable suspicion to

continue to detain a motorist after a traffic stop is completed. Similarly, as appellant observes, this Court has explained:

The nervousness, or lack of it, of the driver pulled over by a Maryland State trooper is not sufficient to form the basis of police suspicion that the driver is engaged in the illegal transportation of drugs. There is no earthly way that a police officer can distinguish the nervousness of a criminal who traffics in narcotics. An individual's physiological reaction to a proposed intrusion into his or her privacy cannot establish probable cause or even grounds to suspect. Permitting a citizen's nervousness to be the basis for a finding of probable cause would confer upon the police a degree of discretion not grounded in police expertise, and, moreover, would be totally insusceptible to judicial review.

*Whitehead v. State,* 116 Md.App. 497, 505, 698 A.2d 1115, 1119 (1997) (nervousness of driver after traffic stop upon being asked for consent to search car, combined with conflicting stories given by driver and passenger as to details of their journey, did not justify continued detention for purpose of conducting canine scan of vehicle for drugs).

Appellant's reliance on these two cases is misplaced. Both cases involved an unlawful continuation of a lawful traffic stop for the purpose of conducting investigation into a separate crime. Unlike the instant case, neither involved a detention, after a consensual encounter, for the purpose of conducting a pat-down to ensure a police officer's safety. In discussing whether a detained motorist's nervousness could justify continuing the detention in order to conduct further investigation, this Court specifically stated in *Whitehead,* 116 Md.App. at 507, 698 A.2d at 1120: "[T]his search is not controlled by the line of cases permitting law enforcement officers to search for weapons in order to protect themselves in the dangerous circumstances of a confrontation with a person whom they have reason to suspect of criminal activity." We explained in *Whitehead* that, because there was no suggestion that the driver or his passenger possessed weapons, *"Terry* and its progeny are not applicable to the present situation." *Id.* at 508, 698 A.2d at 1121. In the case *sub judice,* of course, the

key issue is whether Officer Yankalunas had a reasonable articulable suspicion that appellant was armed.

■ Even assuming *arguendo* that *Ferris* and *Whitehead* are applicable, they would not require a determination that the detention here was unlawful. Both cases indicate only that ordinary nervousness, unaccompanied by other suspicious circumstances, cannot justify the continued detention of a lawfully detained person after the initial detention should be terminated. In denying the motion to suppress, the trial court pointed not only to Officer Yankalunas' testimony about appellant's nervousness, but also to the officer's testimony that appellant seemed to be trying to conceal something in his pocket. Indeed, the officer testified that the pocket was large enough to conceal a weapon, and that a large number of weapons were recovered from the area where the traffic stop was made.

■ As we have observed, the Supreme Court held in *Wilson*, 519 U.S. at 415, 117 S.Ct. at 886, that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." The Court explained that such action is justified by a "weighty interest in officer safety." *Id.* at 413, 117 S.Ct. at 885. It further observed:

> Regrettably, traffic stops may be dangerous encounters. In 1994 alone, there were 5,762 officer assaults and 11 officers killed during traffic pursuits and stops.... [T]he fact that there is more than one occupant of the vehicle increases the possible sources of harm to the officer.

*Id.* Thus, the Court expressly recognized that traffic stops may be fraught with danger. Here, the evidence established that, while engaged in a traffic stop in a high crime area where guns are frequently recovered, Officer Yankalunas observed that appellant, a passenger in the car, was unusually nervous while looking through his pockets for his license and was attempting to conceal something in a pocket that was large enough to hold a handgun. We are satisfied that the evidence established that Officer Yankalunas had a reasonable

**654**

articulable suspicion to detain appellant in order to conduct a pat-down.

**JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.**