919 A.2d 752

**STATE of Maryland**

v.

**Paul Andrew MASON, Jr.**

No. 1661, Sept. Term, 2006.

Court of Special Appeals of Maryland.

March 27, 2007.

Brian S. Kleinbord (Douglas F. Gansler, Atty. Gen., on brief), for appellant.

Robert J. Tully (Stephen R. Tully, on brief), Baltimore, for appellee.

Panel DAVIS, DEBORAH S. EYLER and CHARLES E. MOYLAN, JR., (retired, specially assigned), JJ.

MOYLAN, J.

The appellee, Paul Andrew Mason, Jr., was indicted by the Allegany County Grand Jury for the possession of cocaine with the intent to distribute and related charges. The appellee moved, pretrial, to have the physical evidence suppressed on the ground that it had been unreasonably seized pursuant to the Fourth Amendment. Following a hearing on the motion in the Circuit Court for Allegany County on August 22 and August 31, 2006, and the submission of written memoranda by all parties, Judge Gary G. Leasure, on September 15, 2006, issued an Opinion and Order in which he granted the appellee's motion to suppress.

### State Appeal

The State has appealed, pursuant to Maryland Code, Courts and Judicial Proceedings Article, § 12–302(c), which provides in pertinent part:

(c) *Criminal case.*—In a criminal case, the State may appeal as provided in this subsection.

. . . .

(3) (i) In . . . cases under §§ 5–602 through 5–609 and §§ 5–612 though 5–614 of the Criminal Law Article, the *State may appeal from a decision of a trial court that excludes evidence offered by the State* or requires the return of property *alleged to have been seized in violation of the Constitution of the United States,* the Constitution of Maryland, or the Maryland Declaration of Rights.

. . .

(iii) Before taking the appeal, the State shall certify to the court that the appeal is not taken for purposes of delay and that the evidence excluded or the property required to be returned is substantial proof of a material fact in the proceeding. *The appeal shall be heard and the decision rendered within 120 days of the time that the record on appeal is filed in the appellate court. Otherwise, the decision of the trial court shall be final.*

(iv) If the State appeals on the basis of this paragraph, and if on final appeal the decision of the trial court is affirmed, the charges against the defendant shall be dismissed in the case from which the appeal was taken.

(Emphasis supplied).

Accordingly, our decision in this case, should we opt to reverse, must be filed no later than March 30, 2007. Should we opt to affirm, on the other hand, it really matters very little when we do so, except in the sense that our affirmation, should it be late, would be reduced to a redundancy.

### The Traffic Stop

There are arguably two Fourth Amendment issues before us. We will turn our attention first to the issue that is unquestionably before us.

As part of what was acknowledged to be a narcotics investigation, the Narcotics Unit of the Maryland State Police, along with the Cumberland Police Department, seized the occasion to make a traffic stop of the 1994 Dodge Caravan being driven by the appellee at approximately 4:25 P.M. on May 16, 2006, pursuant to *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). The traffic-based justification was about as strained as one could be, but, under *Whren,* that really does not make any difference.

The appellee was stopped in the environs of Cumberland in a residential neighborhood. The traffic offense was that of "cruising through a stop sign" and making a left-hand turn without having come to a full stop. This occurred in a quiet neighborhood at a time when there were no pedestrians about and no other vehicles about, except for the surveilling police car. The appellee was driving on Pine Avenue and was approaching a T-intersection with Central Avenue. As the appellee pointed out at the suppression hearing, the approach to Central Avenue was down a hill and it would have been almost impossible to negotiate a left turn onto Central Avenue without having come to a virtual full stop. Nonetheless, Officer Tringler of the Cumberland Police Department did not

see a full stop, and he subsequently pulled over the appellee's minivan for the ostensibly limited purpose of issuing the appellee a warning for the stop sign violation.

Approximately twenty-five minutes into the processing of that warning, a drug-sniffing K–9 dog arrived on the scene and "alerted" to the presence of drugs in the appellee's vehicle. As that version of the evidence most favorable to the prevailing party, we will accept as true the fact that 25 minutes elapsed between the initial stop and the K–9 alert. The only issue before Judge Leasure concerning the vehicular stop was that of assessing the Fourth Amendment reasonableness of the 25–minute detention prior to the alert by the K–9 dog. Judge Leasure found and ruled that the length of detention, for the sole purpose of issuing a warning for a stop sign violation, was unreasonable.

> The State contends this search was valid under the pretext stop doctrine enunciated by the United States Supreme Court in *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Under *Whren,* as explicated by Judge Moylan in *Charity v. State of Maryland,* 132 Md.App. 598, 753 A.2d 556 (2000), a police officer may make a traffic stop based on a violation of a traffic law, irrespective of the officer's true motivation. However, there are limits on the duration of the detention:
>
>> [T]he purpose of the justifying traffic stop may not be conveniently or cynically forgotten and not taken up again until after an intervening narcotics investigation has been completed ... [for] the legitimating power of a traffic stop to justify a coincidental investigation has a finite "shelf life," even when the traffic stop ... is not formally terminated.
>
> *Id.* at 614–15, 116 S.Ct. 1769. In short, "the Supreme Court has made it clear that *the detention of the person 'must be temporary and last no longer than is necessary to effectuate the purpose of the stop.'* " *Ferris v. State of Maryland,* 355 Md. 356, 369, 735 A.2d 491 (1999). However, it should be noted that "[i]n determining whether a police officer has exceeded the temporal scope of a lawful stop, the focus will

not be on the length of time an average stop should ordinarily take nor will it be exclusively on a determination ... of whether a traffic stop was literally 'completed.'" *Charity,* 132 Md.App. at 617, 753 A.2d 556. The State has the burden of proving that the stop was justified by an apparent violation of a traffic law, and that the detention during which the secondary motivation is fulfilled is not so substantial as to constitute a second, unjustified, detention of the suspect. *Id.; see also, Whitehead v. State of Maryland,* 116 Md.App. 497, 502, 698 A.2d 1115 (1997); *Snow v. State of Maryland,* 84 Md.App. 243, 578 A.2d 816 (1990); *Ferris v. State of Maryland,* 355 Md. 356, 735 A.2d 491 (1999).

In the present case, the State has failed to meet its burden that the subsequent detention of Defendants was justified under either the *Whren* doctrine or some independent constitutional justification. There are several factors that require such a conclusion. Officer Tringler (the officer whom made the original stop) removed Defendant Mason from the vehicle before radioing Defendant's information back to the barracks. The subsequent questioning was wholly unrelated to the underlying traffic stop ... *See State of Maryland v. Michael Jackson Ofori,* 170 Md.App. 211, 906 A.2d 1089 (2006) (Moylan, J.) ("If, on the other hand, [the officer] was deliberately stalling so that the K–9 unit could arrive before he sent the appellee on his way, the length of the detention was thereby unreasonable.") Further, there was no probable cause to continue the detention for the purpose of unrelated questioning, thereby resulting in an undue delay in the processing of the traffic citation. *See Whitehead,* 116 Md.App. at 504–05, 698 A.2d 1115.

### Extraneous Issues

In appealing that ruling by Judge Leasure, the State is grandly proclaiming factors favorable to it that are not contested and that are, moreover, not dispositive of the single issue before us. The State asserts that the traffic stop was valid. Of course, it was. That is a given. The only question

is that of how long a person may be detained following a valid traffic stop in order to process the traffic stop.

The State asserts that the K–9 alert gave the police probable cause to search the minivan. Of course, it did. No one is contesting that fact, but it has nothing to do with the resolution of the only issue before us. We are assessing the length of the detention between the initial stop and the K–9 alert. We do not care what happened after the K–9 alert. That is not the issue.

## Duration of the Traffic Stop

In determining the reasonableness of a period of detention, at least two critical findings of fact must be made. One involves measuring the duration of the detention. How much time elapsed from the initial stop of the appellee until the K–9 alert on the vehicle? The State's best version of the evidence established that detention as one lasting about 10 minutes. The appellee's best version of the evidence established it as one lasting between 23 and 25 minutes. Because the appellee was the prevailing party, we accept as established truth the fact that the detention lasted for 25 minutes. Any *de novo* determination we may be called upon to make will be based, as a matter of course, on that fact.

Another necessary finding of fact is that of how diligently the stopping officer worked in processing the traffic warning. If Officer Tringler was proceeding with due diligence to write and to issue the traffic warning, the length of the detention was, by definition, reasonable. If, on the other hand, Office Tringler was stalling in order to facilitate the arrival of the K–9 dog, the length of the detention was, by definition, unreasonable. Whether Officer Tringler was or was not stalling is not something that can be established, as a matter of law. It is something that must be found, as a matter of fact, from the totality of the circumstances. Judge Leasure found that the length of the detention was unreasonable in the context of issuing a warning for running a stop sign. We cannot say that that finding was clearly erroneous.

We have looked at the warning that Officer Tringler wrote. It was not a difficult exercise in composition. It consisted of 22 words or numbers and 5 check marks. It contained the appellee's name, address, and the date of the offense. It included the appellee's race, sex, and age. It included the number of the appellee's license tag and his driver's license number. It gave the location of the offense as "Pine at Central" along with the officer's last name and ID number. There were then checked five boxes, indicating the 1) month, 2) day of the week, and 3) hour of the day, as well as two other checkmarks indicating that the offense was 4) a stop sign violation and 5) a moving violation. In the time that elapsed, the officer could have written the warning in cuneiform.

Officer Tringler also explained that when he first stopped the appellee, he approached the driver's door and took from the appellee his driver's license and registration card. He testified that he got back in his police cruiser and called his dispatcher. He then explained his routine.

[W]hen I returned to my vehicle, I get all my materials out that I need, my pen, my stuff, and then I'll contact dispatch, give them all the information I have ... I'd run all that information and then I begin writing my warning. Once I've done the [warning], get all my material and put it back together, make sure I got his license and registration and my warning ... [T]hen I'll sit in my car until dispatch comes back with a transmission on if everything's valid, things like that. And make sure nobody has warrants.

In terms of checking the license and registration with the dispatcher, in this case that had already been done by this particular police team before the traffic stop was even made. This was a narcotics investigation, under the guise of a traffic stop. The members of the Narcotics Unit of the State Police who were orchestrating the entire production had no more than an hour earlier run a computer check with the Department of Motor Vehicles. They had the appellee's license tag number, M638649; the vehicle to which it was listed, a 1994 Dodge Caravan; and the owner's name, Paul Mason, all of which checked out when the traffic stop was made. If Officer

Tringler wanted to know what the computer check would reveal, all he had to do was ask one of the State troopers who were standing a few feet away and who were directing the whole operation. It is at least arguable that the computer check did not have to be done all over again, and that creates a genuine issue of fact as to whether someone was stalling. Under *Whren,* we must be indulgent, but we need not be naive.

In assessing an officer's diligence or dilatoriness, a reviewing court is not oblivious to the nature of the whole exercise. When narcotics investigators make a traffic stop, they are employing a ruse, albeit a ruse sanctioned by *Whren.* The State is being deliberately disingenuous to protest that an officer processing the traffic offense would never deliberately slow down his processing long enough for the ruse to work. Because the officer, after all, is one of the actors engaged in staging the ruse, his performance will inevitably be taken with a grain of salt. How does a reviewing court ignore the fact that if an officer were to announce that a traffic stop had been fully consummated before the K–9 dog arrived, the officer, at least in the eyes of his fellow officers, would have doomed the entire investigative exercise to failure? It would ill-behoove the traffic officer to cross the finish line ahead of the K–9 dog, unless a supervening rationale has made its appearance. That would not be good teamwork. It calls for Samuel Taylor Coleridge's "willing suspension of disbelief" not to recognize this.

In arguing that the length of the detention was not excessive, the State relies heavily on *Byndloss v. State,* 391 Md. 462, 893 A.2d 1119 (2006), in which the Court of Appeals affirmed the trial judge's ruling that a detention for a traffic stop that lasted for 30 minutes was not unreasonable. In *Byndloss,* however, the trial judge had ruled that the length of detention was reasonable and the Court of Appeals affirmed the trial judge's ruling. In *State v. Ofori,* 170 Md.App. 211, 242–43, 906 A.2d 1089 (2006), we explained how the procedural posture of the case is frequently dispositive of the outcome:

The State, in relying heavily on *Byndloss v. State,* ignores *the procedurally dramatic difference between that case and this. The Court of Appeals made its de novo* independent constitutional *conclusion in that case on the basis of the version of the evidence most favorable to the State,* the prevailing party below. *We, by contrast, must make our independent constitutional conclusion on the basis of the version of the evidence most favorable to the defendant.* With that overarching difference in mind, there is no similarity in the respective sets of evidence being reviewed. *It is quite conceivable that on the identical record in the Byndloss case, we ourselves could reach two diametrically opposite conclusions, dependent entirely on which of the parties had been the prevailing party* at the suppression hearing and which version of the facts we, therefore, accepted as true.

*If we were simply doing a color matching test,* comparing the length of the detention in this case with other detention samples, good and bad, *we could easily find good matches going in either direction.* What is involved, however, is more than a mere temporal comparison. As this Court pointed out in *Charity v. State,* 132 Md.App. at 617, 753 A.2d 556:

> *Even a very lengthy detention may be completely reasonable* under certain circumstances. Conversely, *even a very brief detention may be unreasonable* under other circumstances. There is no set formula for measuring in the abstract what should be the reasonable duration of a traffic stop. *We must assess the reasonableness of each detention on a case-by-case basis and not by the running of the clock.*

(Emphasis in original).

We also pointed out in *Ofori* how it is not simply the running of the clock that is important, but also the diligence of the police in processing a traffic stop.

The 24–minute period of delay was not, in and of itself, especially inordinate, particularly in light of *Byndloss v.*

*State* (30 minutes was not unreasonable). But see *Pryor v. State* (20 to 25 minutes was unreasonable). *The time period in this case was on the cusp, and the call with respect to it could readily have gone either way. Critical to the question* as to which way that call should go *was the behavior of Officer Shaffer.* If he was acting diligently in processing the traffic stop, the length of the detention was reasonable. If, on the other hand, he was deliberately stalling so that the K–9 unit could arrive before he sent the appellee on his way, the length of the detention was thereby unreasonable. What was in Officer Shaffer's mind was a quintessential question of fact.

*Id.* at 243, 906 A.2d 1089 (emphasis supplied).

In *Ofori,* as in this case, the suppression hearing judge ruled against the State, and the State appealed. In *Ofori,* as in this case, a traffic stop had been prolonged for 25 minutes before a K–9 dog arrived and alerted on the car. In affirming the trial judge's decision that the detention was unreasonable, we clearly indicated that we could readily have affirmed the trial judge even if he had made a diametrically opposite decision.

The State poses its primary contention: *"Was an approximately 25 minute detention* of Ofori during a valid traffic stop *reasonable* when the purpose of the stop had not yet been completed?" *The answer* to that contention, of course, *is ridiculously simple. If we accept the State's version* of what happened, *it was unquestionably reasonable. If,* on the other hand, *we accept the appellee's version* of what happened, *it was unquestionably unreasonable.* The only remaining issue is that of which version of what happened shall we accept. What says our standard of review in that regard?

The supplemental rule of appellate review of fact-finding directs us to take *that version of the evidence, including all reasonable inferences, most favorable to the prevailing party.* In this case, *that means accepting the inference that Officer Shaffer deliberately prolonged the traffic stop so as to facilitate the arrival of the K–9 unit.* That being the

case, the length of the detention for the traffic stop, if we were called upon to decide that question, would have been unreasonable.

Quite obviously, had the State prevailed at the suppression hearing, our accepted version of the facts would be the precise opposite of what we are accepting as true in this case. This is a classic example of how this aspect of appellate review operates. *Where we come out on a question is a function of where we go in.*

*Id.* at 244–45, 906 A.2d 1089 (emphasis supplied).

There was in this case enough evidence to support a finding that the length of the appellee's detention for processing the traffic stop was reasonable, but there was also enough evidence to support a finding that it was unreasonable. It is for just such cases that we have fact finders, and the fact finder in this case was Judge Leasure. He was free to go either way, with our full approbation whichever way he went.

On the issue of the length of the detention for the processing of a traffic warning, we affirm Judge Leasure's determination that the prolongation of the detention for 25 minutes was unreasonable under the Fourth Amendment.

### The State's Alternative Justification

■ The State, for the first time on appeal, has come forth with an alternate theory of Fourth Amendment justification. It is not necessarily too little, but it is too late. As we have mentioned, this police action against the appellee was, from the very outset, a narcotics investigation utilizing, as it may under *Whren,* a traffic stop as its instrumentality.

If the police choose to bring their action in the traffic law arena, they are, absent the appearance of some supervening rationale, bound by the rules that govern in that arena. Fearful of those rules as they might be applied to an exclusively traffic-related case, the State belatedly invokes a supervening Fourth Amendment rationale. It is a rationale that might well have justified the detention of the appellee in this case even if no stop sign had ever been placed at the intersec-

tion of Pine and Central Avenues. It is a shame the State did not deploy the rationale when it might have counted.

In a purely narrative fashion, relating how the narcotics investigation of the appellee had gotten started, State Trooper Jason Merritt, of the Narcotics Unit, testified that at approximately 4 P.M. on May 16, another member of the unit had received an anonymous telephone call conveying the following information:

> [T]hat a male named Paul Mason was leaving the Cumberland area in a blue colored mini van with Maryland registration ... M63649 and that van would be transporting drugs to the Cumberland area. The van should be leaving the area at 1:00 p.m. and was traveling to Hagerstown to make a pickup of drugs, stop in Sam's Club in Hagerstown and then return to Cumberland. The caller stated that they'd return no later than 5:00 p.m.

After doing a computer check on the license tag number, Trooper Merritt and Sergeant Jason Paolucci drove to a point where they could observe westbound traffic on Interstate 68 coming in toward Cumberland. When they spotted the blue 1994 Dodge Caravan with tag number M63649, they signaled Officer Tringler to put the planned traffic stop into operation.

The State now argues, for the first time on appeal, that under the authority of *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), the substantive detail of the anonymous telephone call, with some not insignificant corroboration, gave the police reasonable articulable suspicion to make a *Terry*-stop of the appellee and his vehicle in order further to investigate their suspicions.

It is unnecessary for us to undertake a detailed examination of this issue. An off-the-cuff surface impression, however, is that the State's theory might well have held up. If so, the police could have stopped the appellant without any necessity of engaging in a *Whren*-sanctioned traffic ruse. Had that more direct approach been taken, moreover, the police would have enjoyed a much longer time in which to await the arrival

of the K–9 dog. *Carter v. State,* 143 Md.App. 670, 692–93, 795 A.2d 790 (2002).

Unfortunately for the State, there was neither peep nor glimmer of any independent *Terry* rationale advanced at the suppression hearing before Judge Leasure. The examination and cross-examination of witnesses explored only the time when the traffic stop occurred and the length of the subsequent detention of the appellee. At the end of the hearing, counsel did not make any legal argument but agreed to submit memoranda arguing their respective positions. The appellee's memorandum made no mention of this alternative rationale. The State's memorandum was cursory in the extreme. We quote it in full:

### STATE'S RESPONSE FOR MEMORANDUM

The Defense has requested the opportunity to submit a memorandum to the Court on the cases above. The State responds briefly below.

Current Cases Involving *Whren* Stops.

*Whitehead v. State,* 116 Md.App. 497, 698 A.2d 1115

*Whren v. U.S.,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)

*Pryor v. State,* 122 Md.App. 671, 716 A.2d 338 (1998).

*Cox v. State,* 161 Md.App. 654, 871 A.2d 647 (2005)

*The State asserts that there is ample evidence to support the stop of Mr. Mason's vehicle under Whren. At issue, it would appear that the Defendants suggest that the stop was impermissibly extended.* In response, the State would ask the court to review both the cellular phone records and radio in log submitted into evidence. In review of the court's notes, the State would ask the court to note that the last call made by TFC Merritt to Sgt. Brown occurred, according to testimony, as Sgt. Brown was arriving at the scene. Sgt. Brown testified the Officer Tringler was still in his car writing when Sgt. Brown arrived. After Brown arrived the K–9 alerted

which established probable cause for the search of the vehicle.

(Emphasis supplied). Nowhere in all of this was the Supreme Court's opinion of *Alabama v. White* even remotely alluded to.

We hold that the State's back-up contention has not been preserved for appellate review. Judge Leasure's Opinion and Order began by stating the issue that was before the court.

The State contends this search was valid under the pretext stop doctrine enunciated by the United States Supreme Court in *Whren v. United States*. We would be ill-disposed to holding that Judge Leasure was in error for failing to rule on some other question that was never presented to him.

The recent opinion by Judge Greene for the Court of Appeals in *Cox v. State,* 397 Md. 200, 916 A.2d 311 (2007) (No. 39, September Term, 2006 filed February 8, 2007), dealt with the question of whether the State, on a defendant's appeal from an adverse suppression ruling, could advance a new and alternative Fourth Amendment rationale for upholding the ruling. The State sought to argue, for the first time on appeal, that even if the State had been guilty of an initial Fourth Amendment violation, presumptively calling for the suppression of physical evidence, there had been an intervening cause (the discovery of an outstanding arrest warrant) that served either as an independent source or as an attenuation of taint. The defendant claimed on appeal that the State's alternative theory had not been preserved for appellate consideration.

The Court of Appeals recognized that the preservation challenge was a legitimate one, but held that, in that particular case, the State had sufficiently raised the issue before the trial court. The State had, indeed, relied on the opinion of this Court that fully expounded the theory that the defendant claimed was unpreserved. Judge Greene's opinion stated:

[T]he State did not use the words "intervening circumstance or cause." *Its basic premise,* however, *was the same at the suppression hearing and on appeal*—that Petitioner was

arrested pursuant to an arrest warrant; the burden was on the defense to show that the arrest warrant was invalid. In addition, *the State relied on Gibson,* 138 Md.App. 399, 771 A.2d 536, *which involved an explanation of the fruit of the poisonous tree doctrine and the applicable process that is employed to dissipate or attenuate the taint of the primary illegality.*

We hold that the issue as to the legality of the arrest was plainly preserved, for appellate review, even though the State did not use the "magic words," "dissipate" or "attenuate," to explain why "the initial encounter [did] not matter"—because of the intervening event, i.e., the discovery of an outstanding warrant and an arrest pursuant thereto. Thus, we are satisfied that the issue was put forth at the trial level and the contention that there was an intervening circumstance is properly before us.

(Emphasis supplied).

The State's alternative contention is not preserved. The State clearly had raised the issue of how to unpoison the fruit of the poisonous tree before the trial court in *Cox v. State.* The State clearly did **NOT** raise the issue of an independent narcotics-related basis for a *Terry* stop before the trial court in this case. It is not enough for the State to claim, in hindsight, that it allusively mentioned something that might have given the judge a clue to an unspoken alternative theory.

■ We must never lose sight of our starting point that warrantless searches and seizures, including the ongoing seizure of a person at the curbside, are presumptively unreasonable and that the burden is on the State to rebut that presumption and persuade the suppression hearing judge otherwise. It is not the judge's job to devise the best strategy and to research the supporting law on behalf of the State in order to persuade himself. The judge is not the prosecutor's law clerk. To do those things is the State's burden, not the judge's burden.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY ALLEGANY COUNTY.**