76 A.3d 400

**Bernard Delaney McCREE, Jr.,**

v.

**STATE of Maryland.**

**No. 525, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

Sept. 24, 2013.

240

244

Jeffrey M. Ross (Paul B. DeWolfe, Public Defender, on the brief) Baltimore, MD, for appellant.

Daniel J. Jawor (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: KEHOE, BERGER, CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

KEHOE, J.

█ In this case we consider a constitutional challenge to Md.Code (2002, 2011 Supp.) § 8–611 of the Criminal Law Article ("CR"), which prohibits the distribution, sale, and possession, with an intent to sell or distribute, items identified by a counterfeit mark. Appellant, Bernard Delaney McCree, Jr., asserts that the statute is unconstitutionally vague and overbroad. We conclude that, when viewed in context and properly construed, the statute is sufficiently clear and its prohibitions sufficiently narrow so as to pass constitutional muster.

After a one day trial by jury in the Circuit Court for Queen Anne's County, McCree was convicted of distributing, selling, and/or possessing items (DVDs) identified by a counterfeit mark having an aggregate value of at least $1,000, possessing with intent to distribute recorded articles (DVDs) without credit, possessing marijuana, and driving on an expired license. He presents five challenges to his convictions, which we have reordered and rephrased:

I. Is CR § 8–611 unconstitutionally vague and overbroad?

II. Did the trial court err in denying McCree's motion to suppress evidence?

III. Did the trial court deny McCree his right to self-representation by failing to comply with Md. Rule 4–215(e)?

IV. Did counts ten through sixteen, as stated on the criminal information sheet, fail to state any cognizable offenses?

V. Did the trial court commit plain error in its instructions to the jury?

We affirm the judgments of the trial court.

## BACKGROUND

### The Traffic Stop

On August 29, 2010, Trooper Cummings, of the Maryland State Police, observed a Honda Odyssey mini-van with two burned out tag lights traveling on Route 301 in Queen Anne's County, Maryland. At 2:59 a.m., he conducted a traffic stop for the apparent violation. McCree was the driver of the van. A woman named Wendy Evans sat in the passenger seat.

During the stop, McCree explained that he was traveling to New York City for the day. Trooper Cummings observed that McCree would not make eye contact with him, and that four tree-shaped air fresheners were "hanging from the driver's seat back to the rear of the van where the hatch opens up." At 3:01 a.m., after obtaining McCree's license, Trooper Cummings radioed a request for both a criminal history and traffic information check on McCree. The results indicated that, within the past year, McCree had been charged with possession of a controlled dangerous substance, and revealed that McCree's license had expired eleven days prior, on August 18, 2010. Based on the combination of these observations, Trooper Cummings decided to call Trooper Martha Connolly and her K–9 partner, Lenya, who were nearby, to the scene.

Meanwhile, at 3:06 a.m., Trooper Cummings requested a criminal history and traffic information check on Evans. The check revealed "[n]othing to make note of." Thereafter, Trooper Cummings began the process of issuing a citation to McCree for driving on an expired license. Trooper Cummings completed filling out the citation at the scene, but did not issue it to McCree. Instead, he began, but did not finish, handwriting an equipment repair order for the burned out tag lights. His efforts related to the repair order were interrupted by the arrival, at 3:14 a.m., of Trooper Connolly.

Trooper Cummings and Trooper Connolly conferred briefly about the situation, and then McCree and Evans were asked to exit the Odyssey. Trooper Cummings remained with

248

McCree and Evans. Trooper Connolly accompanied Lenya, the K–9, as she scanned the vehicle.

At approximately 3:17 a.m.,[1] Lenya—who, at the time, was specially trained to detect various types of heroin, cocaine, marijuana, methamphetamine, ecstasy and hashish—alerted to the presence of illegal substances. Trooper Cummings then searched the vehicle and recovered two partially smoked marijuana cigarettes, one in the sun visor above the driver's seat and the other in a portable ashtray in the center console. McCree—who stated that the marijuana belonged to him—was placed under arrest. Continuing the search of the vehicle, Trooper Cummings discovered approximately 160 suspected counterfeit DVDs inside a black duffle bag on a backseat, a box on the floor containing 187 suspected counterfeit CDs, and, in the rear of the vehicle, a black trash bag containing approximately 45 suspected counterfeit adult DVDs.

Once the contraband was seized, Evans was permitted to return to the vehicle and leave the scene. McCree was transported back to the police station where Trooper Cummings finished handwriting the repair order for the tag lights and issued both the repair order and the citation for driving on an expired license to McCree. Some time thereafter, McCree was charged with the remaining counts at issue in the instant case.

## The Preliminary Motions

Prior to trial, McCree filed a motion to dismiss the counts for distributing, selling, and/or possessing items (DVDs) identified by a counterfeit mark having an aggregate value of at least $1,000—i.e., the counts under CR § 8–611—in which he asserted that the statute was unconstitutionally vague and

---

1. McCree argues that the K–9 alert occurred at approximately 3:20 a.m., rather than at approximately 3:17 a.m. This assertion is not supported by the record, as Trooper Cummings testified that approximately three minutes passed between the time the K–9 unit arrived on the scene—at 3:14 a.m.—and the alert. In any event, for the reasons stated *infra*, even if the alert occurred at 3:20 a.m., such an observation would not change our analysis.

overbroad. The circuit court disagreed and denied the motion. We will discuss McCree's contentions in Part I.

McCree also filed a motion to suppress evidence of the marijuana and DVDs recovered from the Odyssey, in which he argued, in relevant part, that the length of the stop prior to the K–9 alert was unreasonably long. A hearing on the motion was held on January 21, 2011, during which Trooper Cummings, the sole witness, testified as to the above-described events. Based on his testimony, the circuit court denied McCree's motion, concluding that "the stop simply wasn't unreasonable in length by any standard." We will discuss McCree's motion in Part II.

Trial was originally scheduled for February 11, 2011. That morning, prior to the commencement of proceedings, McCree expressed concern about the quality of the representation he was receiving from his assigned public defender, and, eventually, requested "other representation." After substantial discourse on McCree's concerns, the trial court continued the trial but denied McCree's request for replacement counsel. We will discuss McCree's request and the circuit court's response in Part III.

On April 14, 2011, the case proceeded to a trial by jury on the charges.

### The Trial

#### The State's Case

The prosecution called three witnesses to testify in its case-in-chief. Trooper Cummings and Trooper Connolly both testified. They recounted the events at the traffic stop, and testified that they suspected that the DVDs recovered from the van were counterfeit based on their packaging, and, in Trooper Connolly's case, because she had personal knowledge that several of the DVDs were yet to be released for public consumption.

The last witness to testify for the State was Dennis Supik, an investigator with the Content Protection Office of the Motion Picture Association of America, who was qualified as

an expert in the field of identification, manufacturing, distribution and valuation of counterfeit DVDs. He testified that, in his opinion, the DVDs were counterfeit.

Supik based this conclusion on several observations. First, the DVDs were not properly packaged. Supik testified that the cases used to store the DVDs were only half the thickness of the factory standard; that the cases were not properly shrink wrapped; and that they lacked the hologram and security stickers placed on factory originals. Second, the paperwork inside the DVD case was not up to par with factory standards, and lacked the advertising typical of newly packaged DVDs. Third, the discs were blue in color, indicating that they were bought in a stack from a store, as opposed to factory originals, which are silver. Fourth, five of the movies portrayed on the DVDs—*Piranha 3D, Despicable Me, Step Up 3D, Marmaduke,* and *Avatar*—were not available for sale at the time they were recovered, and several of these appeared to have been recorded via camcorder in a theater.[2] Fifth, the DVDs did not contain the names and addresses of the entity that manufactured them, nor, in many instances, the name of the movie company or studio that created or produced the film.

In addition, Supik testified that the DVDs contained "numerous counterfeit marks," including movie titles, and a hologram for the Disney Company, among other examples; that these marks were owned by the movie studios that created the movies; and that the movie studios did not, as a matter of policy, grant to individuals the right to make copies of DVDs or the trademarks contained thereon, but that he had no particular knowledge as to whether McCree had been granted an exception to this general practice. Supik testified that each DVD had a street value of approximately $7.00. He opined that, based on the quantity of DVDs recovered and the

---

2. Supik testified that the DVDs recovered included copies of: *Avatar, Alice in Wonderland, Despicable Me, The Sorcerer's Apprentice, Step–Up 3D, Marmaduke,* and *Piranha 3D.*

number of duplicate copies in his possession, McCree intended to sell or distribute the DVDs.

## The Defense

McCree took the stand as the sole witness in his defense. He testified, in pertinent part, that, at the time of the stop, he was headed to New York to buy "a couple of outfits" for his children for school. He also testified that he was a licensed vendor in Maryland, that he had been buying and selling DVDs for approximately ten years, and that, typically, he bought adult movies for $3.00 and other movies for $2.00 and then resold them for $10.00. He further explained that he had purchased all of the DVDs recovered from the van, including the studio productions, from adult bookstores in New York. He asserted that he did not manufacture the DVDs, and that he had no knowledge as to their manufacture or whether the marks contained thereon were counterfeit.

## The Verdict

Prior to sending the case to the jury, the court granted McCree's motion for judgment of acquittal as to counts for possessing paraphernalia, CR § 5–619(c)(*l*), knowingly transferring sounds recorded without the consent of the owner, CR § 7–308(b), and knowingly transferring a recorded article with the intent to sell without consent of the performer, CR § 7–308(d)(*l*).

After deliberating, the jury convicted McCree of one count of distributing, selling, and/or possessing items (DVDs) identified by a counterfeit mark having an aggregate value of at least $1,000, CR §§ 8–611(b) & (c),[3] seven counts of knowingly

---

3. Those sections provide:

(b) **Prohibited.**—A person may not willfully manufacture, produce, display, advertise, distribute, offer for sale, sell, or possess with the intent to sell or distribute goods or services that the person knows are bearing or are identified by a counterfeit mark.
(c) **Penalty.**—Value at least $1,000.—If the aggregate retail value of the goods or services is $1,000 or more, a person who violates this

possessing with intent to distribute a recorded article (DVDs) without credit, CR § 7–308(d)(2),[4] one count of possessing marijuana, CR § 5–601(a)(1), and driving on an expired license, Md.Code (1977, 2009 Repl.Vol.) § 16–115(f) of the Transportation Article.

McCree was sentenced, concurrently, to incarceration for a period of 30 days for possessing marijuana, and 180 days for each count of possessing with intent to distribute recorded articles (DVDs) without credit. For distributing, selling, and/or possessing items (DVDs) identified by a counterfeit mark having an aggregate value of at least $1,000, McCree was sentenced to incarceration for a period of ten years, with all but one year suspended. The latter sentence was run consecutive to McCree's other sentences.

This appeal followed.

## DISCUSSION

### I. The Constitutional Challenges to Criminal Law Article § 8–611

McCree first contends that CR § 8–611 is unconstitutionally vague and overbroad. That section provides, in pertinent part:

---

section is guilty of the felony of trademark counterfeiting and on conviction:
(i) is subject to imprisonment not exceeding 15 years or a fine not exceeding $10,000 or both; and
(ii) shall transfer all the goods to the owner of the intellectual property.

4. That section provides:
(d) **Transfer of sound or images ... without credit.—**
\* \* \*
(2) A person may not knowingly deliver, offer for delivery, or possess for the purpose of delivery a recorded article on which sounds or images have been transferred or stored, unless the recorded article bears in a prominent place on its outside face or package:
(i) the actual name and street address of the transferor of the sounds or images; and
(ii) the actual name of the performer or group.

(b) **Prohibited.**—A person may not willfully manufacture, produce, display, advertise, distribute, offer for sale, sell, or possess with the intent to sell or distribute goods or services that the person knows are bearing or are identified by a counterfeit mark.

(c) **Penalty.**—Value at least $1,000.—If the aggregate retail value of the goods or services is $1,000 or more, a person who violates this section is guilty of the felony of trademark counterfeiting and on conviction:

 (i) is subject to imprisonment not exceeding 15 years or a fine not exceeding $10,000 or both; and

 (ii) shall transfer all the goods to the owner of the intellectual property.

Where, as here, the constitutionality of a statute has been challenged, we start with a presumption that the statute is valid. *Galloway v. State,* 365 Md. 599, 610, 781 A.2d 851 (2001). The challenging party bears the burden of overcoming the presumption by showing that the statute is: 1) vague, that is, insufficiently clear as to what conduct it prohibits; or 2) overbroad, i.e. that it "sweeps within the ambit of constitutionally protected expressive or associational rights." *Id.* at 611, 781 A.2d 851 (internal quotation marks and citations omitted). Applying these standards, we will address each of McCree's challenges to § 8–611 in turn.

### 1. Vagueness

In order to satisfy due process requirements, a statute must: (1) "be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties," *State v. Phillips,* 210 Md.App. 239, 266, 63 A.3d 51 (2013) (internal quotation marks and citations omitted); and (2) "provide legally fixed standards and adequate guidelines for police, judicial officers, triers of fact and others whose obligation it is to enforce, apply and administer the penal laws." *Id.* McCree's challenge relates to the first requirement. He asserts that § 8–611 fails to indicate with sufficient clarity what conduct falls within its ambit because:

As defined in § 8–611(a)(3), "intellectual property" is almost limitless, encompassing, e.g., any label, term, or word adopted by a person to identify the good or services of the person. . . .

To evaluate whether § 8–611 is sufficiently explicit, we determine whether a person of common intelligence "must necessarily guess at the statute's meaning." *Phillips*, 210 Md.App. at 266, 63 A.3d 51 (internal brackets, quotation marks, and citations omitted). Guesswork is not required:

simply because [the statute] requires conformity to an imprecise normative standard, nor is it vague if the meaning of the words in controversy can be fairly ascertained by reference to judicial determinations, the common law, dictionaries, treatises or even the words themselves, if they possess a common and generally accepted meaning.

*Id.; see Galloway*, 365 Md. at 634, 781 A.2d 851 ("a statute does not become unconstitutionally vague merely because it may not be perfectly clear at the margins" (internal quotation marks and citations omitted)).

■ In applying these standards, we focus on the "facts at hand," *Galloway*, 365 Md. at 616, 781 A.2d 851, and, "if [the] contested provision clearly applies to the conduct of the defendant in [the] case" at bar, we normally do not evaluate whether "the statute is of questionable applicability in foreseeable marginal situations." *Id.* However, a caveat to this rule exists "[w]here . . . the statute appears to impinge upon fundamental constitutional rights such as the First Amendment guarantees of free speech. . . ." *Ayers v. State*, 335 Md. 602, 624–25, 645 A.2d 22 (1994). In such circumstances, we evaluate the statute "for vagueness on its face because its indefiniteness may have a chilling effect on the exercise of First Amendment liberties." *Id.* Because McCree's contentions have potential First Amendment ramifications, we will analyze § 8–611 for vagueness both on its face and as it was applied to McCree.

■ In so doing, we construe Maryland statutes with the assumption that the General Assembly was aware of existing

law when it enacted the statute. *Harry Berenter, Inc. v. Berman,* 258 Md. 290, 298, 265 A.2d 759 (1970). Applying this standard, we do not agree with McCree's contention that § 8–611(b) criminalizes an "almost limitless" range of conduct. McCree isolates the definition of intellectual property from the rest of the statutory scheme in which it appears and ignores the limiting language found in other pertinent subsections of the statute, as well as the existing body of intellectual property law that has been developed in this country. When § 8–611 is read as a whole, and in the context of the principles of statutory and common law that shaped it, the meaning of "intellectual property" becomes sufficiently clear. We first consider two terms, "counterfeit mark" and "intellectual property," that are defined in the statute and are particularly important to its proper construction.

Section § 8–611(b) prohibits certain actions with respect to "goods or services that the person knows are bearing or are identified by a counterfeit mark." Counterfeit marks are defined as follows (emphasis added):

"Counterfeit mark" means:

(i) an unauthorized copy of **intellectual property;** or

(ii) **intellectual property** affixed to goods knowingly sold, offered for sale, manufactured, or distributed, to identify services offered or rendered, without the authority of the owner of the intellectual property.

CR § 8–611(a)(2).

The statute defines "intellectual property" as "a trademark, service mark, trade name, label, **term,** device, design, or **word** adopted or used by a person to identify the goods or services of the person." CR § 8–611(a)(3) (emphasis added). The terms "trademark," "service mark," and "trade name" are legal terms of art with clearly-established meanings.[5] "La-

---

5. A trademark is a "word, phrase, logo, or other graphic symbol used by a manufacturer or seller to distinguish its product or products from those of others." Black's Law Dictionary 1530 (8th Ed.1999). A service mark is a "name, phrase, or other device used to identify and

bel," "device," and "design" are everyday concepts whose meanings can readily be determined by reference to dictionaries, which is a degree of clarity sufficient to satisfy a "void for vagueness" challenge. *See Phillips,* 210 Md.App. at 266, 63 A.3d 51.

To the extent that there is ambiguity in the definition of intellectual property, it lies with the statute's use of "term" and "word." We place these terms in the context of the statutory scheme in which they appear and "employ a limiting construction to the statute to ensure that it provides a standard of conduct and indicates whose sensibilities are to be offended." *Galloway,* 365 Md. at 618, 781 A.2d 851. Placing "term" and "word" in their proper context, it becomes clear that "intellectual property" encompasses only those terms or words that have been "adopted or used by a person to identify the goods or services of the person." CR § 8–611(a)(3). Section 8–611(g) is also instructive. That section provides that: "State or federal registration of intellectual property is prima facie evidence that the intellectual property is a trademark or trade name." *Id.* Subsections (a)(3) and (g), taken together, convince us that a fair reading of the statute is that a person's use of a "term" or "word" is criminally actionable only if the word or term used has been registered or is subject to registration by a third party. Applying this construction, the statute is not void for vagueness. Moreover, on the facts at bar, the marks contained on the DVDs recovered from McCree's vehicle are clearly "intellectual property" because they were either registered or subject to registration by third parties.

### 2. Overbreadth

McCree's second contention is that § 8–611(b) is overbroad because its reach extends to speech protected by the First Amendment to the United States Constitution ("Con-

distinguish the services of a certain provider." *Id.* at 1400. A trade name is a "name, style, or symbol used to distinguish a company, partnership, or business (as opposed to a product or service); the name under which a business operates." *Id.* at 1533.

gress shall make no law ... abridging the freedom of speech, or of the press ....") as applied to the Maryland through the Fourteenth Amendment. *See Eanes v. State,* 318 Md. 436, 445, 569 A.2d 604, *cert. denied,* 496 U.S. 938, 110 S.Ct. 3218, 110 L.Ed.2d 665 (1990). A statute is unconstitutionally overbroad if it includes within its prohibitions what may not be punished under the First and Fourteenth Amendments—i.e., it criminalizes constitutionally protected speech and/or expressive conduct. *See Grayned v. City of Rockford,* 408 U.S. 104, 114, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Galloway,* 365 Md. at 639–40, 781 A.2d 851.

In support of his contention that § 8–611(b) is overbroad, McCree relies on *Commonwealth v. Omar,* 602 Pa. 595, 981 A.2d 179 (2009), a Pennsylvania case which invalidated a state criminal statute prohibiting conduct similar, but not identical, to that proscribed by § 8–611(b). The pertinent difference between the statutes lies in the scope of what each prohibits. As we will explain, the Maryland statute is more narrowly drafted.

The Pennsylvania statute provided, in relevant part, that: "Any person who knowingly manufacturers, **uses,** displays, advertises, distributes, offers for sale, sells or possesses with intent to sell or distribute any items or services bearing or identified by a counterfeit mark [violates the statute]" (emphasis added). The *Omar* Court concluded that the statute's prohibition against "us[ing]" certain marks conflicted with speech and conduct—e.g., "use of words on a sign praising or protesting any entity with a trademarked name"—protected by the First Amendment. 602 Pa. at 607–08, 610–11, 981 A.2d 179. In so holding, the Court distinguished similar statutes of other jurisdictions—including Maryland—which "do not criminalize the 'use' of items with counterfeit marks." *Id.* at 610–11, 981 A.2d 179.

McCree concedes that *Omar* is distinguishable from the case at bar, but argues that: "[a]lthough § 8–611(b) does not include the verb 'use,' as did its Pennsylvania counterpart, it contains the similarly unqualified verbs 'display' and 'distrib-

ute,' which, as [with] instances of 'use,' fall just as easily into the category of free speech verbs" such that "the reasoning of the Court in *Omar* . . . applies with equal force to § 8–611(b)." McCree fails to read the statute as a whole. McCree's suggestion to the contrary, § 8–611(b) does not proscribe the mere "display" or "distribut[ion]" of intellectual property. It criminalizes the willful manufacture, distribution, or marketing of goods or services that the defendant knows "are bearing or are identified by a counterfeit mark." The ambit of conduct prohibited by the statute is well removed from the exercise of the right of free speech.

This construction of § 8–611(b) is consistent with the definition of "counterfeit mark" in § 8–611(a). The definition of "counterfeit mark" is limited to two distinct concepts. The first is that a "counterfeit mark" is defined as "intellectual property affixed to goods knowingly sold, offered for sale, manufactured, or distributed, to identify services offered or rendered, without the authority of the owner of the intellectual property." CR § 8–61 l(a)(2)(ii). Thus, the use of intellectual property is criminally actionable only if used without consent of the owner. This construction is consistent with our analysis in Part I(1) where we explained that a mark is criminally actionable only if it has been registered or is subject to registration by a third party. The second concept embraced by the statutory definition of "counterfeit mark" is "an unauthorized copy of intellectual property. . . ." CR § 8–611(a)(1)(f). We construe this to mean "unauthorized by law." In other words, a mark can be used when it has been registered or is subject to registration by a third party without that party's consent in certain circumstances permitted at law. *See, e.g.,* Gerk & Fleming, NEW PRACTITIONER'S GUIDE TO INTELLECTUAL PROPERTY, 266–68 (ABA Publishing 2012) (explaining that trademark law authorizes certain types of fair use of trademarks, including nominative or descriptive use, as well as "use in comparative advertising, or promotion or identification, and parodying, criticism, or commentary on the famous mark owner or goods or services of the famous

mark owner...."). In our view, these prohibitions are sufficiently narrow so as to pass constitutional muster.

The evidence elicited in the instant trial—the sufficiency of which has not been challenged on appeal—indicated that: (1) McCree knowingly possessed, with the intent to sell or distribute, DVDs bearing marks owned by others; and (2) the placement of the marks on the DVD's in his possession was without the owners' authority and otherwise not permitted by law.[6] McCree's actions clearly ran afoul of the statute. The circuit court did not err in denying McCree's motion to dismiss.

## II. The Motion to Suppress

■ Based on Trooper Cummings' testimony at the suppression hearing, the circuit court denied McCree's motion to suppress, ruling, in pertinent part, that:

> Defense counsel suggests that this one took too long, but I don't know how I, as a Judge, could say to a trooper, hurry it up. * * * [W]hen you add to [normal traffic stop events] the safety concerns and in this particular case, the initial stop was for tail lights which requires the writing or printing out of a paperwork and a traffic citation. But then they found out that he didn't have a license so that generated more paperwork. There's no evidence in this case that the trooper fell asleep or that he was delaying or that he was delayed. The fact that he called a fellow officer who was up the road and who was a K–9 officer is probably just good police work or procedure, but it's really not particularly

---

**6.** In other words, at this stage in the proceeding, there no dispute that McCree possessed DVDs bearing counterfeit marks. For this reason, we do not herein address how to determine if the mark at issue is sufficiently similar to a mark that has been registered, or is subject to registration by a third party, to be deemed a counterfeit. *Compare U.S. v. Lam*, 677 F.3d 190, 199 (4th Cir.2013) (providing that, under Federal law, "[a] mark does not have to be an exact replica of a registered trademark to be deemed a counterfeit"); 18 U.S.C.A. § 2320 (" 'counterfeit mark' means ... (A) a spurious mark ... (ii) that is identical with, **or substantially indistinguishable from,** a [registered] mark ...." (emphasis added)).

relevant here because the amount of time that he took and what he was doing, he was fully occupied the whole time. And, it wasn't until after he completed doing what his principal task was, the male police officer, that the K–9 officer had found some reason to continue the detention. So, the motion to suppress is denied here because the stop simply wasn't unreasonable in length by any standard.

McCree contends that the circuit court erred in so concluding; specifically, he asserts that the length of the stop prior to the K–9 alert was unreasonable because Trooper Cummings should have been able to complete the purposes of the stop within fifteen minutes from its initiation. The result of his failure to do so, in McCree's view, amounted to an unlawful second detention in violation of his rights under the Fourth Amendment to the United States Constitution ("The right of the people to be secure . . . against unreasonable searches and seizures, shall not be violated. . . .").

 In Maryland, the reasonableness of a stop's duration "depends on the totality of the circumstances" present at the scene. *Rowe v. State,* 363 Md. 424, 433, 769 A.2d 879 (2001). "Even a very lengthy detention may be completely reasonable under certain circumstances. Conversely, even a very brief detention may be unreasonable under other circumstances. There is no set formula for measuring in the abstract what should be the reasonable duration of a traffic stop." *State v. Mason,* 173 Md.App. 414, 423, 919 A.2d 752 (2007). Summarizing the principles applicable to such a determination, the Court of Appeals, in *State v. Green,* 375 Md. 595, 826 A.2d 486 (2003), explained that:

the officer's purpose in an ordinary traffic stop is to enforce the laws of the roadway, and ordinarily to investigate the manner of driving with the intent to issue a citation or warning. Once the purpose of that stop has been fulfilled, the continued detention of the car and the occupants amounts to a second detention. Thus, once the underlying basis for the initial traffic stop has concluded, a police-driver encounter which implicates the Fourth Amendment is con-

stitutionally permissible only if either (1) the driver consents to the continuing intrusion or (2) the officer has, at a minimum, a reasonable, articulable suspicion that criminal activity is afoot.

*Id.* at 610, 826 A.2d 486. In other words, a legitimate traffic stop is of reasonable duration when it lasts no longer than is reasonably necessary to effectuate the purposes of the stop. *McKoy v. State*, 127 Md.App. 89, 101, 732 A.2d 312 (1999). Once the purposes of the stop have been effectuated, the stop remains reasonable only with the driver's consent or if reasonable suspicion exists. If neither of these conditions is present, the stop must end. *See State v. Ofori*, 170 Md.App. 211, 235, 906 A.2d 1089 (2006) ("Once the traffic related purpose of the stop has been served, any detention based on the traffic stop should terminate and the stopee should be permitted to leave the scene immediately.").

In determining whether the stop in the instant case was of reasonable duration, "we undertake our own constitutional appraisal of the record by reviewing the law and applying it to the facts," considering them "in the light most favorable to the prevailing party." *McFarlin v. State*, 409 Md. 391, 403, 975 A.2d 862 (2009). We limit our consideration to those facts produced at the suppression hearing, and defer to the circuit court's factual and credibility findings unless clearly erroneous. *Id.*

Applying these standards here, McCree posits that Trooper Cummings had two legitimate purposes to pursue during the traffic stop: first, to issue the equipment repair order for the burned-out tag lights, and, second, to cite McCree for driving on an expired license. McCree's assertion that Trooper Cummings should have—and was legally required to have—accomplished these purposes within fifteen minutes is based solely on testimony provided by Trooper Cummings at the suppression hearing that traffic citations generally take about ten minutes to complete, and equipment repair orders an extra four or five minutes—i.e., a total of about fifteen minutes. McCree argues that, had Trooper Cummings timely completed the stop, the K–9 alert, which occurred approximately eigh-

teen minutes after initiation, would never have occurred. *See Ofori,* 170 Md.App. at 235, 906 A.2d 1089. We are not persuaded.

First, we disagree with McCree's characterization of Trooper Cummings' testimony. As we read the transcript, the trooper testified that, under normal conditions, it takes approximately ten minutes to formulate a traffic citation—i.e., to enter the information into the cruiser's computer system and print off a ticket. Trooper Cummings did not, as McCree suggests, testify that the entire stop, including issuance of the citation, could be completed in that time. Likewise, the trooper testified that a repair order takes about five minutes to handwrite, not five minutes to issue.

Second, McCree ignores the fact that Trooper Cummings had to do more than just issue a repair order and traffic citation to McCree. In addition, he was required to obtain a criminal history and traffic information check on Evans to decide whether she could drive the vehicle from the scene because McCree's license had expired. This process took several minutes for which McCree fails to account.

Third, and in any event, it is well-established in Maryland that the reasonableness of a stop's duration cannot be determined solely based on "the running of the clock," *Mason,* 173 Md.App. at 423, 919 A.2d 752, nor will we in any but exceptional circumstances—circumstances not present in this case—"determine that a stop was unreasonable due to the length of time over which it occurred." *Byndloss v. State,* 391 Md. 462, 485, 893 A.2d 1119 (2006); *see United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (there are no "rigid time limitations on traffic stops"); *Jackson v. State,* 190 Md.App. 497, 512, 988 A.2d 1154 (2010) ("the reasonableness of any particular traffic stop detention must be assessed on a case-by-case basis and not by doing a 'swatch comparison' with other traffic stop cases"); *Charity v. State,* 132 Md.App. 598, 617, 753 A.2d 556 (2000) ("the focus will not be on the length of time an average traffic stop should ordinarily take...."). Instead, we focus on whether the purposes of the stop had been fulfilled at the time of the K–9

alert, and if not, whether the officer was diligently pursuing those purposes at that time. *See, e.g., Byndloss,* 391 Md. at 483, 492, 893 A.2d 1119 (length of detention reasonable where K–9 alert occurred prior to fulfillment of stop's purposes and where officer pursued said purposes with "sufficient diligence").

Here, Trooper Cummings had not, at the time of the K–9 alert, accomplished all of the actions required by what he had learned as a result of the stop—i.e., he had not finished issuing either the repair order or the traffic citation. Further, our review of the record leaves us satisfied that, prior to Lenya's alert, Trooper Cummings pursued these objectives with sufficient diligence such that the initial, valid stop remained ongoing at the time of the alert. Indeed, other than his assertion that Trooper Cummings took longer than fifteen minutes to complete the stop, McCree provides us with no reason as to how or why Trooper Cummings failed to act diligently in his efforts. The circuit court did not err in denying the motion to suppress.[7]

### III. Discharge of Counsel—Maryland Rule 4–215(e)

McCree asserts that the trial court failed to comply with Rule 4–215(e) in two ways: first, by failing to advise him of his

---

**7.** In his reply brief, McCree argues for the first time that Trooper Cummings failed to timely effectuate the purposes of the stop, not because the stop was simply too long—the argument he made before the circuit court and reiterates in his initial appellate brief—but rather, because Trooper Cummings' efforts were interrupted by the K–9 scan for several minutes—i.e., that, upon the arrival of Trooper Connolly to the scene, Trooper Cummings briefly conferred with her about the situation, and then escorted McCree and Evans out of the Odyssey and stood with them for approximately two minutes during the K–9 scan. Contentions that are raised for the first time in an appellant's reply brief are not properly before this Court for review; accordingly, we will not address them. *See* Md. Rule 8–504(a)(6); *Chang v. Brethren Mut. Ins. Co.,* 168 Md.App. 534, 550 n. 7, 897 A.2d 854 (2006) (the rule requires a party to present and argue all points of appeal in their initial brief). In any event, we are not persuaded that the stop was rendered impermissibly long or that Trooper Cummings acted unreasonably by interrupting his clerical activities in order to brief another police officer who had just arrived at the scene as to the situation confronting her and to ensure her safety during the K–9 scan.

right to proceed *pro se;* and second, by failing to explicitly state its reasons for denying his request to replace his assigned public defender. We briefly recount the pertinent facts before addressing each contention in turn.

## 1. The Pertinent Facts

Prior to trial, McCree requested, and was subsequently assigned, a public defender. On the morning of February 11, 2011—the original date set for trial—the trial judge inquired as to whether McCree was ready for trial. McCree responded affirmatively, stating that he had discussed the case with his defense counsel on two or three occasions, that he "would like to continue with him," but that he had concerns about the quality of the representation he was receiving. In McCree's view, his assigned public defender had not sufficiently discussed the case with him, and appeared too enthusiastic about the idea of a plea bargain. Defense counsel responded that he had presented plea bargains offered by the prosecutor to McCree, but that he had also "prepared as though we were going to trial today." Following further investigative discourse, the trial court recessed to provide McCree another opportunity to discuss the case with defense counsel.

Upon his return to court, McCree declared that he needed "other representation" because, in his view, defense counsel had lied to him. Specifically, McCree accused defense counsel of stating, in a phone message, that a motion had been filed, when, in fact, it had not. Defense counsel admitted to leaving the message, and stated that, although he had planned on filing the motion, he ultimately decided against doing so. Defense counsel, along with a second public defender, also explained that the discourse between McCree and defense counsel during the recess had not been "meaningful" and had, moreover, been "cut short" by McCree's yelling and unwillingness to respond to questions "in a logical and rational manner"—i.e., that it was "extremely difficult to discuss the case with Mr. McCree." Accepting the truth of these representations, the trial court then explained to McCree that:

when you apply for representation by the public defender and you are given a panel attorney, you don't have the luxury of selecting who may represent you. You just can't say I don't want this lawyer. You are asking the public defenders office to provide counsel and the public defender's office has done so. I just gave you an opportunity to talk with your lawyer and everybody is back in the courtroom saying that you are telling me you don't want this gentleman to represent you.

In response, McCree maintained that he wanted a public defender "that is going to be honest with me about my case" and reiterated his view that "we have not discussed nothing but plea bargains, not discussing my defense at all."

At some point during this dialogue, the State suggested that the court reschedule the trial. Defense counsel requested that the court order McCree to undergo a competency evaluation in the interim. The court granted both requests, concluding that McCree "is not able to assist in his defense, at this time, as testified to and as represented to this Court by two public defenders. . . ." In so doing, the court stated, in pertinent part, that:

I'm not going to permit Mr. McCree to come back here and tell me that his lawyers won't talk to him or that he only is hearing that they should plead him guilty. That's not what public defenders do. Public defenders represent clients and they do it very well. * * * Mr. McCree is not going to be able to pick and choose who his attorneys will be.

The court also articulated its view that at least one of the public defenders involved in the case was "an extremely competent and conscientious public defender. . . ."

During a subsequent hearing held on April 6, 2011, the trial court determined that McCree was competent to stand trial and assist in his own defense. Trial commenced on April 14, 2011. McCree made no indication during either the April 6 hearing or the April 14 trial that he wished to discharge his counsel or proceed *pro se*.

## 2. The Right to Proceed *Pro Se*

■ In Maryland, a defendant unable to afford representation has two options: he may request and, thereafter, be assigned, a public defender to act on his behalf, *see Gonzales v. State*, 408 Md. 515, 529–30, 970 A.2d 908 (2009) ("A criminal defendant has a right to representation at trial. If the defendant cannot afford private representation, then he or she is entitled to an effective defense from a public defender or court appointed attorney."); or, alternatively, he may proceed *pro se*. *Id.* at 530, 970 A.2d 908 ("A criminal defendant also has the right to forgo representation and to represent him or herself"). Once an attorney has entered an appearance on behalf of a defendant, the defendant can, thereafter, discharge that attorney and proceed *pro se* only if Md. Rule 4–215(e) is satisfied. That rule provides, in pertinent part:

> If a defendant requests permission to discharge an attorney whose appearance has been entered, the court shall permit the defendant to explain the reasons for the request. If the court finds that there is a meritorious reason for the defendant's request, the court shall permit the discharge of counsel; continue the action if necessary; and advise the defendant that if new counsel does not enter an appearance by the next scheduled trial date, the action will proceed to trial with the defendant unrepresented by counsel. If the court finds no meritorious reason for the defendant's request, the court may not permit the discharge of counsel without first informing the defendant that the trial will proceed as scheduled with the defendant unrepresented by counsel if the defendant discharges counsel and does not have new counsel. . . .

McCree asserts that, because Rule 4–215(e) is "designed to protect both the right to assistance of counsel and the right to *pro se* defense," *State v. Brown*, 342 Md. 404, 412, 676 A.2d 513 (1996), the rule required the trial court—at an unspecified point prior to trial—to advise him of his right to proceed *pro se* because he "express[ed] dissatisfaction" with his assigned public defender. There are several problems with this contention.

■ First, the language of Rule 4–215(e) lends no support to McCree's position. Indeed, a nearly identical claim was rejected in *Pinkney v. State*, 427 Md. 77, 46 A.3d 413 (2012). In that case, the defendant argued that the trial court had an obligation under Rule 4–215(e) to "inform [him] of his independent right to discharge counsel and proceed to trial *pro se.*" *Id.* at 88–89, 46 A.3d 413. In rejecting this contention, the Court of Appeals explained that:

> The plain and unambiguous language of the Rule does not require the trial judge to inform a defendant of the option to proceed *pro se* when the judge determines that the defendant's reasons for requesting discharge of counsel are not meritorious, the judge subsequently denies the defendant's request, and the defendant has not made a statement sufficient to indicate to the trial court a desire to invoke the right to self-representation.

*Pinkney*, 427 Md. at 89–90, 46 A.3d 413.

■ Here, McCree made no statement which, in our view, was sufficient to indicate that he desired to represent himself; to the contrary, he indicated a desire for replacement counsel. That, despite the continuance of trial, he retained his defense counsel through the competency hearing and the trial—without returning to the subject—further evidences that McCree never intended to proceed *pro se.* Moreover, it is equally clear that the trial court denied McCree's request. The court's characterization of McCree's demand for a replacement public defender as "play[ing] games with this [c]ourt" leaves no doubt whatsoever that it found McCree's claims to lack merit.

Second, *Williams v. State*, 321 Md. 266, 582 A.2d 803 (1990), relied on by McCree, lends no support to his position. In *Williams*, the defendant, in similar fashion to McCree, requested "another representative." The trial court denied the request without providing the defendant an opportunity to explain the bases of his request. The Court of Appeals reversed, concluding that, in certain circumstances (e.g., incompetent counsel), trial courts were obligated to provide

defendants an opportunity to seek replacement counsel. *Id.* at 274, 582 A.2d 803. The Court interpreted Rule 4–215(e) to require trial courts to: 1) allow defendants an opportunity to explain the bases of their request, and 2) determine if any of them are meritorious. Here, the trial court satisfied both of these requirements. It allowed McCree ample opportunity to, and McCree did, in fact, explain the bases of his request. The court then determined that his assertions lacked merit. The trial court did not run afoul of the obligations imposed on it by *Williams.*

### 3. A Lack of Merit

McCree suggests that the trial court erred by implicitly—rather than explicitly—rejecting his request. We disagree. The record is sufficiently clear that, not only did the trial court find that McCree's request lacked merit, it based its determination on credibility—i.e., the trial court believed the version of events recounted by the public defenders, and not McCree's contrary allegations. We are satisfied that the court sufficiently considered and ruled on McCree's request.

### IV. The Legal Sufficiency of Counts Ten Through Sixteen

McCree next asserts that, as written on the criminal information sheet, counts ten through sixteen—i.e., the charges under CR § 7–308(d)(2)—failed to state a cognizable offense. Specifically, McCree argues that the statute does not require that the violation be "without the consent of the owner," as the information sheet provides. This error, according to McCree, deprived the trial court of subject matter jurisdiction over those counts, and requires that they be vacated. We agree with McCree, in part, but disagree that the trial court lacked jurisdiction.

Quoting the heading of § 7–308(d), the State argues that subsection (d) generally prohibits the "[t]ransfer of sound or images without consent and without credit." This contention is unpersuasive. Section 7–308(d) is subdivided into two distinct parts: (1) and (2). Subsection 7–308(d)(1) prohibits the transfer of recorded articles "without the consent of the

performer." [8] Subsection 7–308(d)(2) prohibits the transfer of recorded articles without providing certain information about "the performer or group"—i.e., credit. McCree was charged with violating § 7–308(d)(2), [9] which does not require the State to prove that McCree lacked an owner's consent.

 Alternatively, the State contends that the defect was not sufficient to deprive the trial court of jurisdiction. We agree. The purpose of a criminal information sheet is to "fulfill the constitutional requirement contained in Article 21 of the Maryland Declaration of Rights that each person charged with a crime must be informed of the accusations against him." *Williams,* 302 Md. 787, 790–91, 490 A.2d 1277 (1985). In order to effectuate this purpose, indictments must "first, characterize the crime; and, second ... provide such description of the criminal act alleged to have been committed as will inform the accused of the specific conduct with which he is charged, thereby enabling him to defend against the accusation and avoid a second prosecution for the same criminal offense." *Williams,* 302 Md. at 791, 490 A.2d 1277; *see also* Md. Rule 4–202(a) (listing the required contents of a charging document). These requirements serve several purposes, including:

(1) putting the accused on notice of what he is called upon to defend by characterizing and describing the crime and

---

8. Subsection 7–308(d)(1) provides:

(1) Except as otherwise provided in this section, a person may not knowingly transfer to or cause to be transferred to a recorded article on which sounds or images have been transferred or stored any performance:
(i) with the intent to sell or cause to be sold for profit or used to promote the sale of any product; and
(ii) without the consent of the performer.

9. Subsection 7–308(d)(2) provides:

(2) A person may not knowingly deliver, offer for delivery, or possess for the purpose of delivery a recorded article on which sounds or images have been transferred or stored, unless the recorded article bears in a prominent place on its outside face or package:
(i) the actual name and street address of the transferor of the sounds or images; and
(ii) the actual name of the performer or group.

conduct; (2) protecting the accused from a future prosecution for the same offense; (3) enabling the accused to prepare for his trial; (4) providing a basis for the court to consider the legal sufficiency of the charging document; and (5) informing the court of the specific crime charged so that, if required, sentence may be pronounced in accordance with the right of the case.

*Williams,* 302 Md. at 791, 490 A.2d 1277.

Here, McCree was charged in counts ten through sixteen with possessing with intent to distribute recorded articles (DVDs) without credit. The information sheet for these counts provided (emphasis added):

And the State's Attorney aforesaid, upon his oath aforesaid further informs the Court and charges that the said BERNARD DELANEY MCCREE JR., on or about the 29th day of August, 2010, at the County aforesaid, **did knowingly possess for sale/distribution/circulation a recorded article to wit: [insert title of DVD—e.g., Alice in Wonderland], on which sounds have been transferred without the consent of the owner** contrary to the form of the Act of Assembly in such case made and provided in violation of Criminal Law Article, Section 7–308(d)(2) of the Annotated Code of Maryland and against the peace, government and dignity of the State.

Thus, the information sheet includes an unnecessary element—without consent of the owner—and omits a necessary element—without credit. But the information does, however, correctly identify § 7–308(d)(2) as the provision alleged to have been violated, as do other documents in the case file. The provision at issue being clear, McCree was not, and is not, exposed to a risk of future prosecution for the same offense. With knowledge of the applicable provision, McCree was on notice of the nature of the allegations against him, and had sufficient opportunity to formulate a defense against these allegations.[10] Together, these observations convince us that

---

10. This observation is further evidenced by the fact that defense counsel correctly cited, and argued in his motions for judgment of acquittal

McCree has not suffered any prejudice stemming from the deficiencies in the criminal information. *See Jones v. State*, 303 Md. 323, 337–39, 493 A.2d 1062 (1985) (unspecified elements of alleged crime sufficiently implied where citation to the statute allegedly violated was provided). In light of this observation, we conclude that the deficiencies on the information sheet are not so defective as to deprive the trial court of subject matter jurisdiction. *See Phenious v. State*, 11 Md. App. 385, 391–392, 274 A.2d 658 (1971) ("Assuming the defect in the indictment, it does not necessarily follow that the trial court was deprived of jurisdiction").

## V. The Jury Instructions

 Last, conceding that he made no objection to the court's instructions at trial, McCree asserts that the trial court committed plain error in its jury instructions. Plain error review is a rarely used and tightly circumscribed method by which appellate courts can, at their discretion, address unpreserved errors by a trial court which "vitally affect[ ] a defendant's right to a fair and impartial trial." *Diggs v. State*, 409 Md. 260, 286, 973 A.2d 796 (2009) (internal quotation marks and citation omitted); *see also Morris v. State*, 153 Md.App. 480, 507, 837 A.2d 248 (2003). As Judge Wilner explained in *Chaney v. State*, 397 Md. 460, 918 A.2d 506 (2007), plain error review:

> is a discretion that appellate courts should rarely exercise, as considerations of both fairness and judiciary efficiency ordinarily require that all challenges that a party desires to make to a trial court's ruling, action, or conduct be presented in the first instance to the trial court so that (1) a proper record can be made with respect to the challenge, and (2) the other parties and the trial judge are given an opportunity to consider and respond to the challenge.

pursuant to § 7–308(d)(2). Thus, not only was McCree notified by the criminal information sheet of the statutory section under which he had been charged, but he had actual knowledge of the proper section and prepared his defense accordingly.

▬▬▬▬▬▬

The Supreme Court summarized the plain error review process in *Puckett v. United States*, 556 U.S. 129, 135, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009):

> [P]lain-error review involves four steps, or prongs. First, there must be an error or defect-some sort of [d]eviation from a legal rule-that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the district court proceedings. Fourth and finally, if the above three prongs are satisfied, the court of appeals has the discretion to remedy the error—discretion which ought to be exercised only if the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings. Meeting all four prongs is difficult, as it should be.

▬▬ The *Puckett* formulation has been expressly adopted by the Court of Appeals. *See State v. Rich*, 415 Md. 567, 578–79, 3 A.3d 1210 (2010); *see also Kelly v. State*, 195 Md.App. 403, 432, 6 A.3d 396 (2010), *cert. denied*, 417 Md. 502, 10 A.3d 1181, *cert. denied sub nom. Kelly v. Maryland*, —— U.S. ——, 131 S.Ct. 2119, 179 L.Ed.2d 912 (2011). Moreover, "[i]n the context of erroneous jury instructions . . . the plain error doctrine has been noticed sparingly. The plain error hurdle, high in all events, nowhere looms larger than in the context of alleged instructional errors." *Peterson v. State*, 196 Md.App. 563, 589, 10 A.3d 838 (2010) (internal citations omitted). We now apply *Puckett* to the facts before us.

First, McCree asserts that the trial court erred by failing to instruct the jury that they were required to find him guilty beyond a reasonable doubt on each and every element of each charged offense. This contention is not persuasive. In *Carroll v. State*, 428 Md. 679, 53 A.3d 1159 (2012), the Court of Appeals rejected a claim similar to McCree's. In *Carroll*, as here, the jury was instructed "with a near verbatim recitation

of MPJI–Cr 2:02." [11] 428 Md. at 685–86, 690–91, 53 A.3d 1159. That instruction provides:

The defendant is presumed to be innocent of the charges. This presumption remains throughout every stage of the trial and is not overcome unless you are convinced beyond a reasonable doubt that the defendant is guilty.

The State has the burden of proving the guilt of the defendant beyond a reasonable doubt. This burden remains on the State throughout the trial. The defendant is not required to prove [his][her] innocence. However, the State is not required to prove guilt beyond all possible doubt or to a mathematical certainty. Nor is the State required to negate every conceivable circumstance of innocence.

A reasonable doubt is a doubt founded upon reason. Proof beyond a reasonable doubt requires such proof as would convince you of the truth of a fact to the extent that you would be willing to act upon such belief without reservation in an important matter in your own business or personal affairs. If you are not satisfied of the defendant's guilt to that extent, then reasonable doubt exists and the defendant must be found not guilty.

*See id.* at 685–86 n. 1, 53 A.3d 1159. The trial court in *Carroll* granted the defendant's request to add the words "of each charge" to the end of the second sentence of MPJI–Cr 2:02,[12] but denied the defendant's request to instruct the jury that "[t]he State has the burden to prove each element of a charge

---

11. *See Ruffin v. State,* 394 Md. 355, 357, 906 A.2d 360 (2006) ("[T]he trial court must closely adhere to the approved pattern instruction on the presumption of innocence and reasonable doubt [in] MPJI–CR 2:02.").

12. Thus, the jury in *Carroll* was instructed, in relevant part, that: "The defendant is presumed to be innocent of the charges. This presumption remains on [the defendant] throughout every stage of the trial and is not overcome unless you are convinced beyond a reasonable doubt that the Defendant is guilty **of each charge.**" (emphasis added). In comparable fashion, the jury in the instant case was instructed that: "The Defendant is charged with a number of charges that will be on the verdict sheet. You must consider each charge separately and return a separate verdict as to each charge."

beyond a reasonable doubt." *Carroll,* 428 Md. at 686, 53 A.3d 1159. On appeal, the defendant argued that the trial court erred in failing to expressly advise the jury that the reasonable doubt standard must be applied to each element of each charged offense. *Id.* at 688, 53 A.3d 1159. The Court of Appeals disagreed, explaining that, "we are, in the end, not persuaded that an otherwise-correct reasonable doubt instruction is rendered constitutionally deficient by the omission of language that each element of the offense charged must be proven beyond a reasonable doubt." *Id.* at 692, 53 A.3d 1159.

The jury in the case at bar was instructed pursuant to MPJI–Cr 2:02,[13] in comparable fashion to the jury in *Carroll.* In our view, the instructions in the present case, as those in *Carroll,* "read as a whole, satisfy the constitutional mandate that the jury be informed that it is the State's burden to prove beyond a reasonable doubt each element of the crime(s) charged." *Carroll,* 428 Md. at 692, 53 A.3d 1159.[14]

■■■ Second, McCree argues that the court erred in failing to instruct the jury that, to find him guilty under CR § 8–611(b), they first had to find that he violated the section "knowingly." The jury was instructed, in pertinent part, that:

Trademark counterfeiting—A person may not willfully manufacture, produce, display, advertise, distribute, offer for sale, sell or possess with the intent to sell or distribute,

---

**13.** The instructions in the instant case mirror MPJI–Cr 2:02 in all but the first paragraph. In that paragraph, the trial court instructed, with minor grammatical changes from the model instruction, that: "The Defendant is presumed to be innocent of the charges, and this presumption remains with the Defendant throughout every stage of the trial and is not overcome unless you are convinced beyond a reasonable doubt that the Defendant is guilty."

**14.** In any event, even if the court erred in instructing the jury as to reasonable doubt, the error was invited by McCree because he requested the reasonable doubt instruction ultimately given by the court. *See State v. Rich,* 415 Md. 567, 575, 3 A.3d 1210 (2010) ("[A] party may not request an instruction and later complain on appeal that the requested instruction was given." (internal quotation marks and citations omitted)).

goods or services that the person knows are bearing or are identified by a counterfeit mark.

This instruction contains two words that infer intent: "willfully" and "knows." Not only does this language communicate that the jury must find that McCree had knowledge of his violation, but the language used is, *verbatim,* the language employed in the statute. The trial court did not err, much less commit plain error, in its instructions to the jury.

For all of these reasons, we affirm the judgments of the trial court.

**THE JUDGMENTS OF THE CIRCUIT COURT FOR QUEEN ANNE'S COUNTY ARE AFFIRMED.**

**APPELLANT TO PAY COSTS.**